**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| TARRILL PETERS, JR. | Civil Action No. |
|             Plaintiff, | |
| | Judge: |
|     vs. | |
| CITY OF CHICAGO, COOK COUNTY, SERGEANT MICHAEL PETRASKI, STAR NUMBER 21001, DETECTIVE JUAN MORALES, STAR NUMBER 20741, DETECTIVE ARTHUR TARASZKIEWICZ, STAR NUMBER 21183, DETECTIVE JOSEPH MARSZALEC, STAR NUMBER 21234, DETECTIVE JOHN CAMPBELL, STAR NUMBER 21279, DETECTIVE THOMAS FLAHERTY, STAR NUMBER 1732, ASSISTANT STATE'S ATTORNEY MARTIN MOORE | JURY TRIAL DEMANDED |
|                     Defendants. | |

## COMPLAINT

Plaintiff Tarrill Peters Jr., by and through his undersigned counsel, alleges the following against Defendants City of Chicago, Cook County, Chicago Police employees Sergeant MICHAEL PETRASKI, Star Number 21001, Detective JUAN MORALES, Star Number 20741, Detective ARTHUR TARASZKIEWICZ, Star Number 21183, Detective JOSEPH MARSZALEC, Star Number 21234, Detective JOHN CAMPBELL, Star Number 21279, and Detective THOMAS FLAHERTY, Star Number 1732, and Cook County Employee Assistant State's Attorney Marty Moore.

## NATURE OF ACTION

1. The civil rights violations in this case stem from City of Chicago police and Cook County State's Attorney misconduct and exploitation of a profound family tragedy. Plaintiff Tarrill Peters Jr. was only 17 years old when he was involved in a chaotic family altercation that resulted in the death of his own father on February 13, 2016. Defendants wrongfully targeted

Plaintiff, fabricated and exaggerated evidence, and coerced fabricated witness testimony, causing Plaintiff to spend three years of his young life falsely imprisoned in Cook County Jail awaiting trial for the alleged crime of first-degree murder. The City of Chicago and Officer Defendants, with the help of Assistant State's Attorney Marty Moore, contorted the events of February 13, 2016 into a first-degree murder charge. For example, in direct contradiction to the available evidence, and with knowledge of its falsity, Defendants wrongly claimed Plaintiff intentionally ran over his father three times with a car, despite his having no motive to do so, pressuring and coercing witnesses to adopt fabricated statements. At all relevant times herein, Defendants knew they did not have probable cause to arrest, charge, and cause Plaintiff to be detained for the alleged crimes based on these facts.

2.      On August 24, 2016, the Cook County State's Attorney's Office initiated criminal proceedings against Plaintiff based on fabricated, coerced, and exaggerated evidence developed by Defendants. The case captioned *People of the State of Illinois v. Tarrill Peters*, 16-CR142301, charged Plaintiff with first-degree murder, two counts of attempted murder, and five counts of aggravated battery. Plaintiff Tarrill Peters Jr. was and is innocent of these associated criminal charges. Defendants knew Plaintiff was innocent of all of these charges during the course of their investigation, when they initiated the criminal proceeding against him, and during the entirety of that criminal proceeding.

3.      Tarrill Peters Jr., then 18 years old, was held without the possibility of bond based on an assistant state's attorney's incorrect representations of the facts at Peters Jr.'s bond hearing, which were premised on the misconduct described herein, that he *intentionally* ran over his father *three times* with an automobile. A judge in bond court specifically cited this portion of Defendants' false narrative presented by the state as the justification for denying bond.

4.     During the subsequent criminal proceedings in the Circuit Court of Cook County, a jury quickly found Plaintiff Tarrill Peters Jr. not guilty of first-degree murder, the only charge on which the state proceeded to trial, after only two hours of deliberations.

5.     At trial, multiple witnesses recounted Defendants telling them to describe the events of that evening in certain ways and not in others during the investigation.  A witness also reported police threats to prosecute her family member in the death of Tarrill Peters, Sr. if she did not give a particular fabricated statement.

6.     After the jury found Plaintiff Tarrill Peters Jr. not guilty, he was released from the custody of the Cook County Department of Corrections on or about August 22, 2019.  At the time of his release from custody, Plaintiff Tarrill Peters Jr. had been unlawfully detained for approximately three (3) years based on a false narrative created and furthered by Defendants that had no basis in reality.

7.     This civil action arises under 42 U.S.C. § 1983, 28 U.S.C. § 1367, and the Fourth Amendment of the United States Constitution.  This action seeks damages against Defendants for depriving Plaintiff of rights secured by the United States Constitution while acting under color of law.

**PARTIES**

8.     Plaintiff Tarrill Peters Jr. is a citizen of the United States who, at all relevant times, was a resident of Cook County, Illinois and the Northern District of Illinois.

9.     Defendant ARTHUR TARASZKIEWICZ, Star Number 21183, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department.  He engaged in the conduct complained of in the course and scope of his employment and under color of law.

10.     Defendant JUAN MORALES, Star Number 20741, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department.  He engaged in the conduct complained of in the course and scope of his employment and under color of law.

11.     Defendant MICHAEL PETRASKI, Star Number 21001, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department.  He engaged in the conduct complained of in the course and scope of his employment and under color of law.

12.     Defendant JOSEPH MARSZALEC, Star Number 21234, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department.  He engaged in the conduct complained of in the course and scope of his employment and under color of law.

13.     Defendant JOHN CAMPBELL, Star Number 21279, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department.  He engaged in the conduct complained of in the course and scope of his employment and under color of law.

14.     Defendant THOMAS FLAHERTY, Star Number 1732, was, at the time of this occurrence, a duly licensed officer with the Chicago Police Department.  He engaged in the conduct complained of in the course and scope of his employment and under color of law.

15.     Messrs. Taraszkiewicz, Morales, Petraski, Marszalec, Campbell, and Flaherty (collectively the "Officer Defendants") are sued in their individual capacities.

16.     Defendant CITY OF CHICAGO (the "City," and with the Officer Defendants, "Defendants") is a municipal corporation duly incorporated under the laws of the State of Illinois, and is the employer and principal of the Officer Defendants.

17.     Defendant MARTIN MOORE was, at relevant times to this lawsuit, an Assistant Cook County State's Attorney and engaged in the conduct complained of in the course and scope of his employment in an investigative role, and is sued in his individual capacity.

18.     Defendant Moore is sued in his individual capacity.

19.     Defendant COOK COUNTY is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorneys' Office and the Cook County Board. At the time of this occurrence, Cook County was the employer of Defendant Martin Moore and is therefore a necessary party in this lawsuit.

## JURISDICTION AND VENUE

20.      Plaintiff Tarrill Peters Jr. brings his claims under 42 U.S.C. § 1983, 28 U.S.C. § 1367, and the Fourth Amendment of the United States Constitution.

21.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(3).

22.     Venue is proper under 28 U.S.C. §§ l39l(b)(1) and (b)(2) in "a judicial district where any defendant resides, if all defendants reside in the same State" or in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

23.     Upon information and belief, all individual Defendants reside in the State of Illinois and the Northern District of Illinois.  The events giving rise to the claim involved in this case occurred in the Northern District of Illinois.

## FACTUAL ALLEGATIONS

24.     Between February 13, 2016 and August 23, 2016, Officer Defendants conducted an "investigation" into the death of Tarrill Peters, Sr., which was contaminated with persistent misconduct and designed to secure a swift conviction of Mr. Peters' son, Plaintiff Tarrill Peters Jr., despite overwhelming evidence that he did not commit the alleged crimes.  With the assistance of Defendant Martin Moore, Officer Defendants consistently engaged in improper and illegal conduct, including, *inter alia*, disregarding the prominence of conflicting witness

statements, fabricating evidence utilizing coercive investigatory techniques, which led to the unlawful pre-trial detention of Tarrill Peters, Jr., based on the charge of intentional first degree murder—a charge for which Defendants knew there was no probable cause.

## The February 13, 2016 Death of Tarrill Peters, Sr.

25.      Plaintiff Tarrill Peters Jr. is the son of the late Tarrill Peters, Sr. and Ms. Angela Hughes.

26.      Angela Hughes is the sister of Michelle Hughes and Nakia "Mook" Hughes. Michelle Hughes has two sons: Arsenio Hughes and Darrius Ellman.

27.      On February 13, 2016, 17-year-old Tarrill Peters, Jr. attended a family gathering at 5430 West Kamerling Avenue, Chicago, Cook County, Illinois in recognition of the death of his cousin.  The family gathering took place at Nakia Hughes' home.

28.      That day, Tarrill Peters, Sr. dropped off Plaintiff, Angela Hughes, and Plaintiff's siblings to the Hughes' family gathering, leaving soon after to visit his own family nearby.

29.      A few hours later, Tarrill Peters, Sr. returned to Nakia Hughes' home to pick up his son, Tarrill Peters, Jr., and other members of his family.  The Hughes family insisted that Tarrill Peters, Sr. leave.

30.      Shortly thereafter, as Tarrill Peters, Sr. attempted to leave the gathering with his family, a verbal altercation broke out between Tarrill Peters, Sr. and several members of the Hughes family, a chaotic scene that spilled into the front yard and street.  The scene turned violent, and Arsenio Hughes struck Tarrill Peters, Sr., causing him to fall to the ground near his running vehicle, which was double parked in the street.

31.      Members of a large crowd were beating, punching, and stomping Tarrill Peters, Sr. as he lay on the ground by the running vehicle.

32.     Plaintiff Tarrill Peters Jr. left the vehicle and attempted to protect his father, at which point members of the crowd began attacking him.

33.     Under significant fear, anxiety, and emotional pressure, Plaintiff—who had no driver's license or experience driving—jumped into the driver's seat of the vehicle and drove away from the scene, eastbound.

34.     Plaintiff then attempted to make a "U-turn" to retrieve his father.

35.     Around this time, Nakia "Mook" Hughes began following Plaintiff Tarrill Peters Jr. in an SUV.

36.     As he drove down Kamerling Avenue, Plaintiff passed over at least one speed bump and accidentally hit several parked cars.

37.     During the ensuing chaos, Tarrill Peters, Sr. suffered life-threatening injuries.

38.     Tarrill Peters, Sr. tragically died later that evening at Stroger Hospital.

39.     At Tarrill Peters, Jr.'s criminal trial, the Assistant Medical Examiner who examined Tarrill Peters, Sr.'s body indicated that she based her decision to categorize the manner of death as "homicide" based in part on police reports and explanations offered by Defendants— what the police told her—source material which was deficient, suspect, and/or rife with fabrications as outlined elsewhere within this Complaint. Trial Transcript at 176:2-177:24, *People of the State of Illinois v. Tarrill Peters*, No. 16 CR 14283-01 (Ill. Cir. Ct. Cook Cnty., Aug. 21, 2019) ("Aug. 21, 2019 Trial Tr.").

### The Initial Investigation: Day One

40.     On February 13, 2016, Officer Defendant Detective ARTHUR TARASZKIEWICZ, Star Number 21183, was the primary detective assigned to the case.

41.    That evening, with TARASZKIEWICZ as primary detective, Chicago Police Department personnel collectively interviewed five witnesses at the scene of the accident.

42.    Among the witnesses interviewed at the scene were Michelle Hughes, Nakia Hughes, Julia Henderson, Albert Anderson, and Taconda Johnson.

43.    Notably, Nakia Hughes related that he believed the incident to be an accident.

44.    Collectively, the five witness statements relayed to Defendant Officers at the scene of the accident did not provide a clear narrative to implicate Plaintiff; each witness relayed varying accounts of the events and each witness's statement conflicted with that of the others.

45.    Shortly thereafter, assisting detectives relocated to West Suburban Hospital and interviewed five additional witnesses, including Angela Hughes and Roy Anderson.

46.    The additional witnesses interviewed at West Suburban Hospital included Taconda Douglas, Tiffany McGinnis, and Shondra Hughes.

47.    As was the case at the scene, the witnesses at West Suburban Hospital gave varying and contradictory accounts of the events that did not provide probable cause or justification to believe that Plaintiff Tarrill Peters Jr. intentionally murdered his father by striking him three times with an automobile.

48.    At the hospital, Defendant Officers attempted to coerce witnesses into the false narrative that Tarrill Peters, Jr. had intentionally run over his father three times with a vehicle.

49.    After taking the witness statements from the five additional witnesses at West Suburban Hospital, Officer Defendants were left without clarity as to what happened at the gathering.

50.    Despite the inconsistent statements, Officer Defendants reported in the February 13, 2016 Case Supplemental Report that Plaintiff Tarrill Peters Jr. struck his father three times

with a vehicle, evincing their decision that regardless of the facts, that was the narrative they had chosen and would pressure witnesses into adopting.  This unsupported conclusion based on inconsistent initial interviews marked the beginning of the Officer Defendants' conspiracy to falsely charge Plaintiff Tarrill Peters Jr. The Officer Defendants knew at this point that this narrative was false.

### The Initial Investigation: Days Two Through Five

51.     On February 14, 2016, Tyaill Peters and Brittany Peters, the minor sisters of Tarrill Peters, Jr., were interviewed by Defendants MARSZALEC and CAMPBELL at Area North Headquarters.

52.     According to Officer Defendants' Report, Tyaill and Brittany Peters both relayed accounts similar to that of their mother, Angela Hughes, explaining that members of the Hughes' family, including Darrius Ellman and Arsenio Hughes, struck their father, causing him to fall into the street before Tarrill Peters, Jr. drove away in the car.

53.     Tyaill was 15 years old at the time of the incident on February 13, 2016.  Trial Transcript at 45:17, *People of the State of Illinois v. Tarrill Peters*, No. 16 CR 14283-01 (Ill. Cir. Ct. Cook Cnty., Aug. 22, 2019) ("Aug. 22, 2019 Trial Tr."). At trial, Tyaill Peters testified that during encounters with Officer Defendants, she was scared and that Officer Defendants told her what to say.  *Id.* at 55:8-9.

54.     On February 18, 2016, Officer Defendants issued investigative alerts for, among others, Darrius Ellman and Arsenio Hughes, to no avail.

55.     According to Officer Defendants' Case Supplementary Report for February 14, 2016 to February 18, 2016, Officer Defendants also met with Michelle Hughes at her residence on February 18, 2016.

56.     On February 18, 2016, Officer Defendants issued a "Probable Cause to Arrest" Investigative Alert for Plaintiff Tarrill Peters Jr.

**The Initial Detention and Subsequent Release of Plaintiff Tarrill Peters Jr.: Day Six**

57.     On February 19, 2016, Plaintiff Tarrill Peters Jr. turned himself in and was taken into custody at Area North Headquarters at 1:15 p.m.

58.     On February 20, 2016, less than 24 hours later, Plaintiff Tarrill Peters Jr. was released without charges.

59.     Notably, Defendant Officers told Plaintiff Tarrill Peters Jr. that they would "come back" for him once they found enough "evidence," illustrating their continued, singular, and malicious focus on targeting Peters, Jr. regardless of the facts.

60.     Officer Defendants TARASZKIEWICZ, PETRASKI, and MORALES submitted the Case Supplementary Report for February 19, 2016 to February 20, 2016 with approval from Defendant FLAHERTY.

**The Conspiracy to Build a Narrative Based on Inconsistent, Coerced, Fabricated Testimony: Days 20 Through 185**

61.     Between February 20, 2016 and August 23, 2016, Defendants knowingly coerced false testimony and relied on blatantly unreliable and inconsistent witness statements to build a false case against Plaintiff Tarrill Peters Jr.

62.     Over the course of a six-month investigation, and after speaking with responding Officer Defendants on the evening of February 13, 2016, several witness statements questionably evolved to include suspicious levels of detail and curious affirmative statements that Plaintiff Tarrill Peters Jr. purposely hit his father three times with the vehicle, often directly contradicting prior statements of these witnesses.

63. The changes in several witness statements from the evening of February 13, 2016 to August 23, 2016 are indicative of Defendants' conspiracy to fabricate evidence in order to support a case against Plaintiff Tarrill Peters Jr.

**Nakia Hughes' Statement**

64. On February 13, 2016, at the scene of the incident, Nakia Hughes relayed to Officer Defendants that Plaintiff Tarrill Peters Jr. made a *single* U-turn and drove back westbound and struck several people with the car. He stated that he believed the incident to be an *accident*. He did not speak with officers again regarding the incident.

**Angela Hughes' Statement**

65. Angela Hughes, after being transported to West Suburban hospital as a result of her injuries, relayed that, as the altercation arose, the crowd began to push and "DD" punched Plaintiff Tarrill Peters Jr.'s father, causing him to fall to the ground. Angela Hughes further relayed that "Arsenio" and "Michael" then began to kick and punch her husband while he was on the ground. She further related that she tended to her husband until someone tased her. She made no mention of Plaintiff Tarrill Peters Jr.'s striking his father with a car.

**Michelle Hughes's February 2016 Statements**

66. On February 13, 2016, Michelle Hughes called 911 and reported that Tarrill Peters, Sr. had been hit by a vehicle *twice*. That same night, after police arrived, she told reporting detectives that she observed Plaintiff Tarrill Peters Jr. in a car stopped in front of the house and saw him pull away, striking multiple people as he drove off. She further stated that Plaintiff Tarrill Peters Jr. drove eastbound on Kamerling Avenue, performed a U-turn and drove back westbound on Kamerling Avenue, striking his father with the vehicle.

67.     Then, on February 25, 2016, at the prompting of Defendants, who had previously attempted to interview her on February 18, 2016, Michelle Hughes provided a vastly different story from her initial account and her 911 phone call.  This time, and for the first time, upon pressure from Officer Defendants, Ms. Hughes relayed that Plaintiff Tarrill Peters Jr. hit his father *three times* and that on the evening of February 13, 2016, she heard yelling outside while she was inside of the residence.  Ms. Hughes stated that when she went outside, she observed Plaintiff Tarrill Peters Jr.'s father lying on the ground after having been punched and knocked down by one of her sons.  Ms. Hughes now claimed to have seen Plaintiff Tarrill Peters Jr. in a vehicle facing eastbound on Kamerling.  Ms. Hughes stated that she then saw Plaintiff Tarrill Peters Jr. pull forward in said vehicle and run over his father's head with the left rear tire, perform a U-turn, and proceed at a high rate of speed westbound on Kamerling Avenue.  Ms. Hughes claimed that she then saw Plaintiff Tarrill Peters Jr. strike parked cars,  his father, Angela Hughes, and Roy Anderson, who was sent tumbling by the impact.  Finally, Michelle Hughes stated that Plaintiff Tarrill Peters Jr. came back heading westbound on Kamerling Avenue, striking his father and causing him to spin around on the street.

68.     The changes in Hughes' statements from her 911 call and initial interview to her February 25, 2016 interview were prompted by police coercion and demonstrate the conspiracy to knowingly fabricate false evidence against Plaintiff Tarrill Peters Jr.

### Roy Anderson's Statements

69.     In his initial interview with detectives following the incident, Roy Anderson relayed that Plaintiff Tarrill Peters Jr. jumped into a car heading eastbound on Kamerling Avenue. He told detectives he was not sure if the vehicle hit Tarrill Peters, Sr.  He observed the vehicle make a U-turn at the end of block and swerve into Tarrill Peters, Sr., himself, and Angela Hughes,

hitting all three. Minutes later Mr. Anderson saw the vehicle traveling westbound on Kamerling Avenue swerving and possibly hitting parked vehicles. At that point, he went into the home and called 911 from his cellphone.

70.     In an April 9, 2016 interview at a police station in his home state of Missouri; however, Roy Anderson relayed to Officer Defendant that he observed Plaintiff Tarrill Peters Jr. jump into the driver's seat and take off eastbound on Kamerling Avenue. Anderson stated that he did not see the vehicle run over Tarrill Peters, Sr., but that he observed Plaintiff Tarrill Peters Jr. driving back westbound, eventually striking him, Angela Hughes, and Tarrill Peters, Sr. Anderson added that he also witnessed, from inside the residence through the window, Plaintiff Tarrill Peters Jr. run over his father again. At no point during the interview did Roy Anderson corroborate Michelle Hughes's February 25, 2016 statements that Anderson was sent tumbling upon being hit with the vehicle, or that, upon the alleged, fabricated third hit with the vehicle, Tarrill Peters, Sr. was spun around in the street.

71.     Mr. Anderson's April 9, 2016 statement contradicted his earlier statement regarding a supposed third hit of Tarrill Peters, Sr. with the vehicle. When interviewed at the scene, he made no mention of a third hit; it was only upon the pressure and prompting from Defendants that this phantom third hit materialized.

**Taconda Douglas' Statements**

72.     On February 13, 2016, Taconda Douglas relayed at West Suburban Hospital that she was on the first floor looking out the front window of the residence when she observed a large group fighting. She stated that she then saw Plaintiff Tarrill Peters Jr. run and jump into a parked car on the driver's side, then drive at the group of people in the street, striking some

people in the group.  Ms. Douglas further reported that she observed Plaintiff Tarrill Peters Jr.

return and run over Tarrill Peters, Sr. again before fleeing in an unknown direction.

73.     On April 9, 2016, however, Officer Defendants also interviewed Taconda

Douglas in Missouri and this time recorded new, significant, and notably different testimony.

Ms. Douglas relayed that she did not see the car run over Tarrill Peters, Sr.'s head but that she

"believed" this had happened.  She further relayed that she heard a "pop" when she believed the

car ran over Tarrill Peters, Sr.'s head, despite having relayed to reporting officers on February

13, 2016, that she observed the incident from inside the residence.

74.     Finally, Ms. Douglas relayed that while looking through the front window of the

residence, she saw Plaintiff Tarrill Peters Jr. run over his father a third time and that she believed

that third time Tarrill Peters, Sr. had been run over was what probably caused his death.  After

pressure from Officer Defendants, who knew this to be false, this supposition and the assertion

that Plaintiff Tarrill Peters Jr. allegedly ran over his father three times appeared for the first time

in her April 9, 2016 interview.

75.     At no point during her April 9, 2016 interview and subsequent statement did

Taconda Douglas corroborate Michelle Hughes' February 25, 2016 coerced, fabricated

statements that Roy Anderson was sent tumbling upon being hit with the vehicle, or that, upon

the alleged third hit with the vehicle, Tarrill Peters, Sr. was spun around in the street.

### *The April 2016 Arrest of Arsenio Hughes on Unrelated Charges and Resulting Coerced Fabricated Statements from Michelle and Arsenio Hughes*

76.     On April 12, 2016, the police took Arsenio Hughes, the son of Michelle Hughes,

into police custody on a charge of possession of cannabis.

77.     Officer Defendants leveraged the potential drug charge to coerce false statements

from Arsenio Hughes in relation to the February 13, 2016 death of Tarrill Peters, Sr.

78.     Upon police pressure during interrogation, Arsenio Hughes alleged to Officer Defendants that he struck Plaintiff Tarrill Peters Jr.'s father in self-defense, and that Plaintiff Tarrill Peters Jr. intentionally ran over his father.

79.     During his interrogation and videotaped statement, Arsenio Hughes referred to the incident as an "accident" on multiple occasions but was corrected by a Defendant Assistant State's Attorney, Martin "Marty" Moore, who prompted Hughes to label Plaintiff Tarrill Peters Jr.'s actions "intentional," and was as well previously instructed to falsely offer these and other statements in a similar fashion by Defendant Officers.

80.     The same day—nearly two months after the incident—Michelle Hughes appeared at the conclusion of Arsenio Hughes' statement to provide Officer Defendants with a previously unshared flash-drive containing video footage obtained from a private security camera from 5430 W. Kamerling Avenue. (This footage did not capture the incident, rather a view of the street several houses down.)

81.     Upon information and belief, on May 5, 2016, Arsenio Hughes's April 12, 2016 charge was *nolle prossed*, i.e., the state declined to continue its prosecution.

82.     On July 24, 2016, a separate assistant state's attorney met with Officer Defendant TARASZKIEWICZ and Michelle Hughes for an interview.

83.     Michelle Hughes testified at trial that police, upon information and belief, Officer Defendants, came to her home and discussed Arsenio's arrest prior to the July 24, 2016 interrogation. Michelle Hughes testified that during this encounter, police told her that "someone was going to jail" and that they "didn't know who it's going to be but somebody is going," an implicit threat of prosecution of her son if she did not adopt the concocted narrative provided by Officer Defendants. Trial Transcript at 166:16-20, *People of the State of Illinois v.*

*Tarrill Peters*, No. 16 CR 14283-01 (Ill. Cir. Ct. Cook Cnty., Aug. 20, 2019) ("Aug. 20, 2019 Trial Tr."). As evidence of their guilty conscience and cover-up of wrongful actions, Officer Defendants did not document this visit or conversations in case supplementary reports or elsewhere.

84.     At the July 24, 2016 interview, Michelle Hughes was asked by Officer Defendants if she would make a new statement on video, which she did. In this statement she relayed that Plaintiff Tarrill Peters Jr. hit his father three times with the vehicle and that Plaintiff Tarrill Peters Jr. drove past the residence four times, a contradiction of her earlier statements to 911 and reporting detectives on the scene, and a reflection of her fear, instilled by Defendant Officers, that her sons would be charged for murder in the death of Tarrill Peters, Sr. if she did not offer this statement.

85.     Michelle Hughes testified at trial that shortly before this July 24, 2016 taped interview Officer Defendants threatened to "get her sons." Aug. 20, 2019 Trial Tr. at 171:4-6.

86.     Officer Defendants TARASZKIEWICZ and MORALES submitted the Case Supplementary Report for July 24, 2016 with approval from Defendant FLAHERTY.

**The Arrest and Subsequent Unlawful Detention of Plaintiff Tarrill Peters Jr.: Day 186**

87.     On August 23, 2016—nearly a month after Michelle Hughes's final statement, and over six months after the death of Tarrill Peters, Sr.—Officer Defendants arrived at Angela Hughes's home and took Plaintiff Tarrill Peters Jr. into custody.

88.     Plaintiff Tarrill Peters Jr. was charged with first degree murder, two counts of attempted murder, and five counts of aggravated battery.

89.     An initial bond hearing was held for Plaintiff Tarrill Peters Jr. on August 24, 2016.

90.     Based on the coerced and fabricated witness statements generated by the actions in concert of Officer Defendants, the judge determined that there was probable cause to detain Plaintiff Tarrill Peters Jr. without bond on the charge of first-degree murder.  In making this determination to detain Plaintiff Tarrill Peters Jr., the judge stated, "[o]ne time pass through this scene with this car.  But three times?  That shows some impulse problems."  Transcript of Bond Hearing at 8:18-20, *People of the State of Illinois v. Tarrill Peters*, No. 16 MC1 10539801 (Ill. Cir. Ct. Cook Cnty., Aug. 24, 2016) ("Aug. 24, 2016 Bond Hearing Tr.").

91.     The court further stated, based on the "proof" provided by Officer Defendants, "I believe the proof is evident.  The presumption is great, sir, that you committed these acts.  I cannot think of any condition or set of conditions I could set to keep the community safe.  You will be held without bail, sir.  Special conditions of bond are granted."  *Id.* at 9:6-11.

92.     Plaintiff Tarrill Peters Jr. was denied bond on August 24, 2016, and on other occasions during the pendency of the criminal prosecution when motions for bail reduction were brought; at minimum, on October 4, 2016 and November 17, 2016.  Upon information and belief, the phantom third hit was the cause of these subsequent no-bond determinations, just as it was at Plaintiff Tarrill Peters Jr.'s first bond hearing.

93.     Plaintiff Tarrill Peters Jr. was indicted on September 23, 2016.

94.     Through counsel, Plaintiff Tarrill Peters Jr. made demands for trial, at minimum, on September 23, 2016, September 30, 2016, June 4, 2019, July 1, 2019, and August 19, 2019.

95.     On August 19, 2019, two charges for aggravated battery with use of a deadly weapon, two charges for aggravated battery in a public place, one charge for aggravated battery with intent to cause great bodily harm, and two charges for attempted murder with intent to kill were disposed of as *nolle prosequi*.

96.     On August 22, 2019, Plaintiff Tarrill Peters Jr. was acquitted on all charges and released after less than two hours of jury deliberation following a four-day trial, which took place between August 19, 2019 and August 22, 2019.

97.     On August 22, 2019, the charges previously disposed of via *nolle prosequi* had their disposition amended by the Court to "Verdict of Not Guilty" by reason of conversion, according to certified records from the Office of the Clerk.

98.     Plaintiff Tarrill Peters Jr., was held without bail for approximately three years awaiting trial before he was ultimately released.

**The Immense Harm to Plaintiff Tarrill Peters Jr.**

99.     As a direct result of the unlawful conduct of Defendants, Plaintiff Tarrill Peters Jr. spent formative years of his young life locked up without possibility of release in the Cook County Jails Maximum Security Division, facing the prospect of life in prison due to the meritless first-degree murder offense charged against him without probable cause.

100.    While wrongfully detained in Cook County Jail, Plaintiff Tarrill Peters Jr. spent days locked in his cell, taking a toll on his health and preventing him from communicating with his loved ones. He missed birthdays, graduations, and special events in his siblings' lives. His opportunities to connect with loved ones by phone were further limited because he was repeatedly threatened with gang violence. He was attacked and bit at least twice by other pre-trial detainees.

101.    Moreover, while wrongfully detained in Cook County Jail's Maximum Security Division as a teenager, Plaintiff Tarrill Peters Jr. suffered emotionally: facing sleepless nights contemplating the gravity of the charges against him and, in the event of his release,

contemplating how people would perceive him after he was portrayed as a murderer. On more than occasion, he contemplated suicide.

102.     To date, Plaintiff Tarrill Peters Jr. still has difficulty sleeping, and suffers from nightmares about the time he wrongfully endured at Cook County Jail.

103.     As a direct result of the unlawful conduct of Officer Defendants, Plaintiff Tarrill Peters Jr. has developed overwhelming feelings of fear and distrust with respect to police officers and the criminal justice system—emotions he did not harbor prior to the events stated herein. Though some of his own family members are police officers, he struggles to overcome these feelings.

104.     As a direct result of the unlawful conduct of Defendants, Plaintiff Tarrill Peters Jr. was painted as a heartless killer in media reports and online search results.  He agonizes upon meeting new people in his life, wondering if they view him as a monster despite his being fully exonerated in his father's death, continually compounding the grief of losing his father.

105.     Plaintiff Tarrill Peters Jr.'s story was used as a tool by at least one public school teacher, leading his peers to adopt the false view that he intentionally killed his father despite the truth of the circumstances of his father's death.  His then girlfriend and multiple friends were in these classes, compounding the emotional pain and suffering.

106.     Plaintiff Tarrill Peters Jr. continues to suffer ongoing trauma, barriers to employment, reputational damage, and other harm from the above-described unlawful acts of Defendants that caused his three-year detention in Cook County Jail without probable cause, primarily as a teenager.

**The Unconstitutional Patterns and Practices of the Chicago Police Department**

107.    The Fourth Amendment violations described above, including the wrongful no-bond detention of Plaintiff Tarrill Peters Jr., without probable cause, and the unlawful and knowing use of false coerced witness testimony were caused by the unconstitutional patterns and practices of the Chicago Police Department.

108.    In 2015, the United States Department of Justice, Civil Rights Division, Special Litigation Section, and the United States Attorney's Office for the Northern District of Illinois, jointly initiated an investigation (the "Joint Investigation") of the Chicago Police Department to determine whether the Chicago Police Department engages in a pattern or practice of unlawful conduct and, if so, what systemic deficiencies or practices facilitate or cause this pattern or practice.

109.    The 2017 report on the Joint Investigation (the "DOJ Report")[1] found that the Chicago Police Department had patterns or practices of violating the Fourth Amendment.

110.    The DOJ Report "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy" and relayed that "Chicago's deficient accountability systems contribute to CPD's pattern or practice of unconstitutional conduct" pointing specifically to, among other things, Defendants' systems for investigating police conduct, and policies and practices that impede the investigation of officer misconduct.  *See* DOJ Report, pp. 46-50.

111.    Further, the DOJ Report found that the Chicago Police Department "does not provide officers with sufficient direction, supervision, or support to ensure lawful and effective policing."  *See generally* DOJ Report, pp. 93-105.

---

[1] *See* U.S. Dep't of Just., Civil Rights Division, Investigation of the Chicago Police Department (2017), https://www.justice.gov/opa/file/925846/download.

112.     According to the DOJ Report, the investigation revealed "engrained deficiencies in the systems CPD uses to provide officers with supervision and training."  Regarding training, the DOJ Report noted,

> CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result.

DOJ Report, pp. 93-94.

113.     With respect to supervision, the DOJ Report explained,

> Instead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result.

DOJ Report, p. 105.

114.     Moreover, the DOJ Report relayed that Chicago Police Department officers routinely employed questionable tactics in order to coerce people into providing information, including arresting individuals in attempts to gain information about crimes.  *See* DOJ Report, p. 148.

115.     Moreover, the DOJ Report relayed that Chicago Police Department officers routinely employed questionable tactics in order to coerce people into providing information, including arresting individuals in attempts to gain information about crimes.  *See* DOJ Report, p. 148.

116.     In addition to the patterns and practices found in the DOJ Report, the Chicago

Police Department has repeatedly been found to have elicited coerced fabricated testimony in

support of criminal convictions, resulting in the eventual reversal of the convictions for

numerous innocent individuals.[2]

117.     In the investigation of Plaintiff Tarrill Peters Jr. the Chicago Police Department

utilized what was a longstanding Chicago Police Department practice called an "investigative

alert," in which supervisors could order police to arrest individuals they encounter on the street

without the need for a search warrant or the officer observing any crime.

118.     Investigative alerts were issued for Michelle Hughes, Arsenio Hughes, Michael

Johnson, Darrius Elman, and Derrick Rogers.  Aug. 21, 2019 Trial Tr. at 119:24-120:20.

119.     Officer Defendant TARASZKIEWICZ, Star Number 21183, has had, at a

minimum, 11 complaints made against him in the course and scope of his employment and under

color of law, including, among other things, criminal misconduct, bribery/official corruption,

operation/personnel violations, use of force, and illegal search.

120.     Officer Defendant MORALES, Star Number 20741, has had, at a minimum, 11

complaints made against him in the course and scope of his employment and under color of law,

including, among other things, operation/personnel violations, use of force, verbal abuse,

supervisory responsibilities, and illegal search.

121.     Officer Defendant PETRASKI, Star Number 21001, has had, at a minimum, 15

complaints made against him in the course and scope of his employment and under color of law,

---

[2] *See* Sarah Macaraeg and Yana Kunichoff, *'Nothing Happens to the Police': Forced Confessions Go Unpunished in Chicago*, THE GUARDIAN (Jan. 28, 2016), available at: https://www.theguardian.com/us-news/2016/jan/28/chicago-police-department-false-confessions-torture; *see also Notice of Possible Review of Your Conviction*, the Exoneration Project, available at: https://www.exonerationproject.org/chicago-coerced-confession-review/ ("Last October, Cook County reached a settlement with the Englewood Four, who were exonerated after spending 16 years wrongfully incarcerated primarily on the basis of false confessions coerced by certain Chicago Police Department detectives.").

including, among other things, conduct unbecoming, use of force, operation/personnel violations, and illegal search. Three of those complaints were sustained.

122. Officer Defendant MARSZALEC, Star Number 21234, has had, at a minimum, 16 complaints made against him in the course and scope of his employment and under color of law, including, among other things, illegal search, operation/personnel violations, use of force, supervisory responsibilities, and bribery/official corruption.

123. Officer Defendant CAMPBELL, Star Number 21279, has had, at a minimum, 9 complaints made against him in the course and scope of his employment and under color of law, including, among other things, lockup procedures, operation/personnel violations, verbal abuse, illegal search, and use of force.

124. Officer Defendant FLAHERTY, Star Number 1732, has had, at a minimum, 16 complaints made against him in the course and scope of his employment and under color of law, including, among other things, operation/personnel violations, use of force, lockup procedures, false arrest, and conduct unbecoming.

125. According to the Chicago Reporter's Settling for Misconduct database, Officer Defendant Detective THOMAS FLAHERTY, Star Number 1732, in addition to the misconduct detailed *supra* in Paragraph 123, was involved in a police misconduct settlement in which he and other officers were alleged to have fabricated reports and concealed evidence from witness statements for the relative of a high-ranking Chicago official.[3] This settlement cost the City of Chicago $250,000.

---

[3] *See Settling for Misconduct*, Chi. Rep., https://projects.chicagoreporter.com/settlements (last visited Aug. 9, 2021).

126.     Despite the, at minimum, 78 complaints against Defendant Officers, no meaningful actions were taken by the City to protect the public from their misconduct, emboldening them and causing them to commit the misconduct described in this Complaint.

127.     The City of Chicago and Chicago Police Department also maintains a "code of silence" among officers that encourages, enables, and causes misconduct, including the conspiratorial misconduct described in this Complaint.

128.     The CPD teaches its officers not to violate the code of silence. Officers are instructed that:

> Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence.

*Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 902 (N.D. Ill. 2016).

129.     The City of Chicago has known about and encouraged this code of silence in the CPD at all times relevant to this Complaint, and has not taken action to address it.

130.     For example, in 2012, in the case of *Obrycka v. City of Chicago*, No. 07-cv-2372 (N.D. Ill. 2012), a federal jury found that the City of Chicago "had a widespread custom or practice of failing to adequately investigate and/or discipline its officers and/or of a police code of silence."

131.     The 2017 DOJ Report observed that both the City of Chicago and CPD were aware of the code of silence within CPD:

   a.     "Mayor [Rahm Emanuel] has acknowledged that a 'code of silence' exists in the CPD, and his opinion is shared by current officers and former high-level CPD officials interviewed during our investigation."

   b.     "[A]ttempts to hold officers accountable are also frustrated by police officers' code of silence. The City, police officers, and leadership within CPD and its police officer union acknowledge that a code of silence among Chicago police officers exists, extending to lying and affirmative efforts to

conceal evidence."

DOJ Report, pp. 8, 75.

132.    In April 2016, Mayor Lori Lightfoot chaired the City's Police Accountability Task Force, and after investigation into the pervasive misconduct in Chicago policing concluded: "[T]he code of silence is not just an unwritten rule, or an unfortunate element of police culture past and present. The code of silence is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City." Chicago Police Accountability Task Force, Task Force Report (2016), p. 70, https://perma.cc/H5BJ-7WFL.

133.    In January 2020, Chicago's Interim Police Superintendent Charlie Beck stated "of course" there is such a code of silence in the CPD.

134.    In an October 2020 speech to CPD recruits, CPD Superintendent David Brown discussed the existence and transactional nature of the code of silence, noting that officers "protect each other" from accountability for potential wrongdoing.

135.    The Code of Silence was active and at work in Defendant Officers' handling of Peters, Jr.'s case in multiple ways, including but not limited to:

   a)    causing Defendant Officers to agree on the night of the incident, despite conflicting and inconsistent reports from witnesses, to pursue the false narrative that Tarrill Peters, Jr. intentionally struck his father three times with a car;

   b)    causing Defendant Officers to coerce false witness statements without fear of rebuke or consequence; and

   c)    causing Defendant Officers to threaten family members of alternative suspects in Tarrill Peters, Sr.'s death that their children could be locked up.

136.    The City and CPD's custom and practices of failing to discipline and train officers and maintenance and tolerance of a code of silence caused Mr. Peters's constitutional injuries and

were taken with deliberate indifference to their consequences to members of the public like Mr. Peters.

137.    Efforts to reform Chicago police training, discipline, and code of silence policies and practices in order to make them lawful in recent years have been inadequate and ineffective.

### COUNT I: 42 U.S.C. § 1983 – Unlawful Pretrial Detention (*Manuel*)

138.    Plaintiff restates and realleges paragraphs 1-136 of this Complaint as though fully set forth herein.

139.    Plaintiff's right to be free from unlawful pre-trial detention is protected by the Fourth and Fourteenth Amendments to the U.S. Constitution.[4]

140.    All of the individual Officer Defendants named in this Complaint are Employees of the City of Chicago Police Department.

141.    Defendant Martin Moore is an Employee of Cook County and its State's Attorney's Office.

142.    The acts of the Defendants alleged above were conducted within the scope of the Defendants' employment or duties.

143.    As described more fully above, the Defendants made, influenced, or participated in the decision to initiate the criminal prosecution against Plaintiff Tarrill Peters Jr. without probable cause, based on a manufactured and false narrative that he intentionally struck his father three times with an automobile.

144.    Defendants used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the initiation, continuation, and perpetuation of judicial

---

[4] Plaintiff acknowledges that under current Seventh Circuit precedent, including *Lewis v. Chicago*, 914 F.3d 472, 479 (7th Cir. 2019), unlawful pre-trial detention claims sound in the Fourth, rather than the Fourteenth, Amendment. Plaintiff includes this assertion to preserve the issue for appeal and in the event of intervening changes in law.

proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

145.    As described more fully above, the individual Defendants, while acting independently, jointly, and in conspiracy with other unnamed individuals, seized Plaintiff and caused Plaintiff to be unlawfully detained, without probable cause or any lawful justification and on the basis of fabricated evidence in violation of the Fourth Amendment of the U.S. Constitution.

146.    Defendants conducted a tainted investigation, including witness interviews, in such a manner as to support the unlawful detention and prosecution of Plaintiff Tarrill Peters Jr. on a charge for first degree murder, intentionally disregarding the truth and his innocence.

147.    Following Plaintiff Tarrill Peters Jr.'s release from police custody on February 19, 2016, Defendants traveled to Missouri to interview Roy Anderson and Taconda Douglas.  The new statements that Mr. Anderson and Ms. Douglas made after police showed up at their home contradicted their prior statements in significant regard but were consistent with the false police narrative Defendant Officers decided to pursue on the night of the incident.

148.    Further, Defendants leveraged the April 12, 2016 arrest of Arsenio Hughes to knowingly coerce false statements from Arsenio Hughes and additionally knowingly coerced false statements from his mother, Michelle Hughes, in order to support excessive and unfounded criminal proceedings against Tarrill Peters, Jr.

149.    Officer Defendants threatened Michelle Hughes with retaliation against her son if she did not provide them with the false statement they desired.

150.    Despite having issued investigative alerts for Arsenio Hughes as early as February 18, 2016, Officer Defendants had not spoken to Arsenio Hughes until he was brought into police custody for an unrelated drug charge on April 12, 2016.

151.    It was only while Arsenio Hughes was in police custody for that April 12, 2016 charge that Arsenio Hughes made his one and only statement with respect to the death of Tarrill Peters, Sr.: that Tarrill Peters, Jr. intentionally ran over his father three times. This statement was created by coercion against Arsenio Hughes in support of a narrative Defendants knew to be false, and included real-time "correction" of Hughes's characterization of the events from an accident to an intentional act.

152.    The similarly false statements eventually coerced from Michelle Hughes on July 24, 2016 were made only after she had learned of her own son's arrest and after police came to her home and threatened her family, and were wildly inconsistent with those she had made on multiple previous occasions in relation to the incident.

153.    Defendants proffered a dubious collection of false statements from Michelle Hughes and others to support that they had probable cause to believe Plaintiff Tarrill Peters Jr. intentionally murdered his father by striking him three times intentionally with an automobile.

154.    Based on this evidence, fabricated by Defendants, a court adjudicated "no bond" for Plaintiff Tarrill Peters Jr., remanding him to county custody to await trial, which he did for three years in the Cook County Jail Maximum Security Division. The Court specifically cited the manufactured third hit of Tarrill Peters, Sr. as the justification for this denial of bond.  Aug. 24, 2016 Bond Hearing Tr.

155.    Due to the gravity of the first degree murder charge against him and the false information provided to the Grand Jury and to the Assistant State's Attorney appearing in Bond

Court regarding the number of times Tarrill Peters, Jr. allegedly intentionally hit his father with the vehicle on February 13, 2016—all proffered by Defendants—Plaintiff Tarrill Peters Jr. was denied bail on multiple occasions. Upon information and belief, Plaintiff Tarrill Peters Jr. was denied bail due to the supposed but non-existent third intentional hit of his father with the vehicle.

156.     On August 22, 2019, the criminal proceeding was resolved in Tarrill Peters, Jr.'s favor when he was found not guilty of first degree murder following the pre-trial *nolle prosequi* of other charges (which were later converted to findings of Not Guilty).

157.     On August 22, 2019, Tarrill Peters, Jr. was finally released from detention.

158.     Plaintiff Tarrill Peters Jr. was unconstitutionally detained for approximately three (3) years until he was found not guilty of first degree murder.

159.     Plaintiff Tarrill Peters Jr.'s detention of approximately three (3) years was due to the Defendants' fabricated evidence during the underlying criminal investigation of Tarrill Peters, Sr.'s death.

160.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff Tarrill Peters Jr.'s constitutional rights, the truth, and his innocence.

161.     The Officer Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago in the manner described more fully above.

162.     As a result of this unlawful misconduct, Plaintiff Tarrill Peters Jr. was injured, including being exposed to public scandal and disgrace, loss of liberty, physical and emotional damages, legal fees, trauma, lost wages, and mental distress.

**COUNT II: 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

163.    Plaintiff restates and realleges paragraphs 1-136 of this Complaint as though fully set forth herein.

164.    As described more fully above, Defendants reached an agreement amongst themselves to punish Plaintiff for a crime he did not commit, and thereby deprived Plaintiff Tarrill Peters Jr. of his constitutional rights, all as described more fully throughout this complaint.

165.    In this manner, Defendants, acting in concert with each other, have conspired by concerted action to accomplish an unlawful purpose (the unlawful pre-trial detention of Plaintiff Tarrill Peters Jr. in violation of the Fourth and Fourteenth Amendments) by an unlawful means (including coercion of false witness statements known to be false).

166.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

167.    The overt acts committed by Defendants were objectively unreasonable and were undertaken with malice, willfulness, and reckless indifference to the rights of Plaintiff Tarrill Peters Jr. and others and with total disregard of the truth and of Plaintiff's innocence.

168.    The Defendants' actions were taken under color of law and within the scope of their employment.

169.    The Officer Defendants' misconduct described in this Count was undertaken pursuant to the policies, practices, and customs of Defendant City of Chicago in the manner described more fully above.

170.    As a direct and proximate result of the illicit prior agreement and actions of Officer Defendants referenced above, Plaintiff Tarrill Peters Jr.'s rights were violated, and he

suffered damages, severe emotional distress and anguish, and a deprivation of his liberty, as is more fully alleged above.

171.    In addition, the violations of the Plaintiff Tarrill Peters Jr.'s rights proximately caused the Plaintiff loss of liberty, mental anguish, embarrassment and humiliation, trauma, emotional distress, lost wages, exposed him to public scandal and disgrace, and caused him to incur various expenses including legal fees, all to Plaintiff's damage.

## COUNT III: 42 U.S.C. § 1983 – *Monell* Liability - Failure to Discipline, Failure to Train, Failure to Eliminate the Code of Silence

172.    Plaintiff restates and realleges paragraphs 1-135 of this Complaint as though fully set forth herein.

173.    The unlawful actions of Defendant Officers resulted from unlawful policies, practices, customs, and usages of the City of Chicago, including failing to adequately discipline and train CPD officers and failing to eliminate CPD's code of silence.

174.    The City of Chicago has a duty to properly supervise its officers and agents, including disciplining and training officers to prevent constitutional violations, and an obligation to address its code of silence to prevent constitutional violations.

175.    Despite the City of Chicago's actual and constructive notice of its systematic failings in terms of constitutional policing,  Officer Defendants and their dozens of disciplinary complaints, and the code of silence rampant within the department, it failed to take any action to remedy these defects.

176.    The City of Chicago's deliberate indifference to training and disciplining officers and eliminating the code of silence enabled the unlawful detention and conspiracy by Defendant Officers.

177.    The failure to train and discipline officers and maintenance of a code of silence are customs, practices, policies, and usages that caused Defendant Officers to violate Plaintiff Tarrill Peters Jr.'s constitutional rights.

178.    Defendant City of Chicago has a duty to properly supervise its employees and agents. Defendant breached that duty by improperly training, authorizing, encouraging or directing officers and to engage in impermissible seizures, without reasonable suspicion or probable cause and without sufficient legal basis, and/or condoning such actions.

179.    The City of Chicago further failed to properly supervise all Chicago Police personnel by improperly training, authorizing, encouraging or directing officers and deputies to submit reports and statements to prosecutors with the intent of instituting and continuing judicial proceedings for alleged crimes for which there is no reasonable suspicion or probable cause.

180.    As a direct and proximate result of the misconduct by the Defendants, caused by the City of Chicago's policies, practices, customs, and usages, Plaintiff Tarrill Peters Jr. suffered damages, including loss of liberty, physical injury and sickness suffered while wrongfully detained, exposure to public scandal and disgrace, lost wages, attorneys' fees, and emotional pain and suffering, in violation of his constitutional rights.

**COUNT IV: 745 ILCS 10/9-102 - Indemnification**

181.    Plaintiff restates and realleges paragraphs 1-136 of this Complaint as though fully set forth herein.

182.    Defendant City of Chicago is the employer of the Defendant Officers.

183.    Officers Defendants committed the acts alleged above under color of law and in the scope of their employment with the City of Chicago.

184.     Defendant City of Chicago is responsible for paying any judgment entered against Officer Defendants.  Plaintiff Tarrill Peters Jr. therefore demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the Officer Defendants as damages, attorneys' fees, costs, and interest.

185.     Defendant Cook County is the employer of Defendant Moore.

186.     Defendant Moore committed the acts alleged above under color of law and in the scope of his employment with Cook County.  Defendant Cook County is responsible for any judgment entered against Defendant Moore.   Plaintiff Tarrill Peters Jr. therefore demands judgment against Defendant Cook County in the amounts awarded to Plaintiff against Defendant Moore as damages, attorneys' fees, costs, and interest.

**PRAYER FOR RELIEF**

As a result of these violations, Plaintiff Tarrill Peters Jr. requests that the Court grant the following relief against Defendants:

A.     Declare the conduct of Defendants to have violated the rights guaranteed to Plaintiff under the United States Constitution; and

B.     Grant an order providing:

    i.     Judgment for compensatory damages against Defendants jointly and severally in an amount to be determined at trial.

    ii.     Judgment for punitive damages against all Defendants jointly and severally in an amount to be determined at trial.

    iii.     Judgment for nominal damages to vindicate the violation of Plaintiff's rights under the Constitution of the United States of America.

    iv.    An award of the costs of this action against Defendants jointly and severally, including reasonable attorneys' fees, in accordance with 42 U.S.C. §§ 1988, 12205 and 29 U.S.C. § 794.

    v.    Such other and further relief that the Court deems appropriate.

### JURY DEMAND

Plaintiff respectfully demands trial by jury for all triable matters.

Dated: August 17, 2021          Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

*s/ Craig C. Martin*
Craig C. Martin
Michael G. Babbitt
Aaron J. Hersh
Bianca L. Valdez
300 North LaSalle
Chicago, Illinois 60654-3406
(312) 728-9000
Email: cmartin@willkie.com
      mbabbitt@willkie.com
      ahersh@willkie.com
      bvaldez@willkie.com

Daniel Massoglia
First Defense Legal Aid
601 S. California Ave.
Chicago, IL 60612
(708) 797-3066
Email: daniel@first-defense.org

*Attorneys for Tarrill Peters, Jr.*