**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| TARRILL PETERS, JR. ) | |
| ) | Case No. 21 C 4366 |
| Plaintiff, ) | |
| v. ) | Judge Charles R. Norgle |
| ) | Magistrate Susan E. Cox |
| CITY OF CHICAGO, COOK COUNTY, ) | |
| SERGEANT MICHAEL PETRASKI, STAR ) | |
| NUMBER 21001, DETECTIVE NAN MORALES, ) | |
| STAR NUMBER 20741, DETECTIVE ARTHUR ) | |
| TARASZKIEWICZ, STAR NUMBER 21183, ) | |
| DETECTIVE JOSEPH MARSZALEC, STAR ) | |
| NUMBER 21234, DETECTIVE JOHN ) | |
| CAMPBELL, STAR NUMBER 21279, ) | |
| DETECTIVE THOMAS FLAHERTY, STAR ) | |
| NUMBER 1732, ASSISTANT STATE'S ) | |
| ATTORNEY MARTIN MOORS ) | |
| ) | |
| Defendants. ) | |

**CITY DEFENDANTS' JOINT REPLY TO
<u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

Defendants Sgt. Michael Petrasksi, Det. Juan Morales, Det. Arthur Taraszkiewicz, Det. Joseph Marszalec, Det. John Campbell, Sgt. and Thomas Flaherty ("Defendant Officers"), by and through one of their attorneys, Jessica L. Griff, Assistant Corporation Counsel, Supervisor, and Defendant City of Chicago ("City"), by and through its attorney, Celia Meza, Corporation Counsel(hereinafter referred to collectively as "Defendants"), pursuant to Fed.R.Civ.P. 12(b)(6), respectfully reply to their motion to dismiss Plaintiff's complaint with prejudice. In support thereof, Defendants state as follows:

**<u>FACTUAL BACKGROUND</u>**

Defendants incorporate herein by reference the factual background and contained facts outlined in their motion to dismiss.

**<u>STANDARD OF REVIEW</u>**

Defendants incorporate herein by reference the standard of review outlined in their motion to

1

dismiss.

## ARGUMENT

**I.     PLAINTIFF CANNOT SUCCEED ON HIS PRETRIAL DETENTION CLAIM UNDER THE FOURTH AMENDMENT.**

Plaintiff claims that his Fourth Amendment pre-trial detention claim is the result of supposed fabricated and coerced testimony allegedly created by the Defendant Officers. Plaintiff's response ignores the fact that his own Complaint sets forth sufficient evidence to establish probable cause under the Fourth Amendment to arrest and charge Plaintiff with murder, aggravated battery, and attempt murder. Instead, he focuses, without support, on the fact that he would not have been detained absent the alleged "fabrication" of additional information from the witnesses. While Plaintiff does not assert, which Defendant Officers allegedly coerced testimony, this claim also fails because the allegations in Plaintiff's Complaint show that the Defendant Officers had probable cause to arrest Plaintiff and to detain him for murder and this is true, even presuming that the witnesses **later** changed their factual narrative to some varying degrees, supposedly at the behest of the Defendant Officers.

Yet Plaintiff asserts, "but for the fabricated and heinous narrative that [Plaintiff] *intentionally* ran over his father's head *three times* with a vehicle, [Plaintiff] would not have been detained for years while waiting for trial." Dkt. No. 46, Page 4, ¶1 and Dkt. No. 1 ¶3. In sum, Plaintiff essentially argues that if the Defendant Officers only charged Plaintiff with running over his father's head two times, instead of three, Plaintiff would not have been pre-trial detained. This assertion is illogical and simply not supported by law. Plaintiff points to nothing in his response to support that the "third hit" narrative caused his prolonged detention. In fact, at the October 4, 2018 bond hearing, the Court specifically reasoned that he would not lower Plaintiff's bond because "the person that you're proposing that the Defendant go live with right now as charged is one of the victims of the attempt murder." Exhibit A to Defendants' Reply, Oct. 4, 2018 transcript at pg. 12:10-12. Contrary to Plaintiff's argument, this clearly

2

shows that neither the first-degree murder charge, nor the "third hit" were the bases for denying Plaintiff bond on that date.

In addition, intentionally running someone's head over with your vehicle only once, causing their death is sufficient to charge with first degree murder. Of course, the undisputed record here shows that the witnesses alleged that Plaintiff did this not once, **but twice**. Dkt. No. 1 at ¶¶64, 66, 69,72. These statements gave the Defendant Officers probable cause to arrest, which in this case was more than sufficient to justify the subsequent charges and Plaintiff's pre-trial detention. Moreover, a witnesses' subjective belief that the incident may have been an accident is not dispositive of the issue of whether probable cause existed to arrest, charge and detain Plaintiff. See for example, *Neiman v. Keane*, 232 F.3d 577, 580 (7th Cir. 2000) ("Probable cause exists at the time of arrest when reasonably trustworthy information, facts and circumstances would lead a prudent person to believe that a suspect had committed or was committing a crime."). The determination of probable cause is objective—"an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)).

### A. The Officers had Probable Cause and Therefore Plaintiff's Pre-trial Detention Was Lawful.

As outlined in Defendants' Joint Motion to Dismiss Plaintiff's Complaint, Plaintiff unquestionably asserts that at least 3 different witnesses gave statements at or near the time of the incident to the Defendant Officers that provided probable cause to arrest and detain Plaintiff for his father's murder.[1] Dkt. No.1 at ¶¶64, 66, 69,72. Nakia Hughes, relayed to the Defendant Officers at the scene of the incident that Plaintiff **made a single U-turn and drove back** westbound and struck several

---

[1] Defendants' motion focuses on the charges of aggravated battery and attempt murder, however, it is clear that the statements of each and every witness, which were included in Plaintiff's Complaint, support a basis to charge and detain Plaintiff for first degree murder, attempt murder, and aggravated battery.

3

people with the car. Again, Nakia Hughes subjective belief that the incident was an accident is not dispositive of the question of whether probable cause existed. What is relevant to the probable cause determination is that Nakia Hughes initial statement supported the Defendant Officers arresting and charging Plaintiff with murder.

The changing of Michelle Hughes testimony **at trial** indicating that the Defendant Officers told her "Someone was going to jail" if she did not adopt the supposed concocted narrative provided by the Defendant Officers Dkt. No.1 at ¶83 is irrelevant as to whether her 911 call at the time of the incident sufficiently established probable cause. Dkt. No.1 at ¶66.

As a side note, Plaintiff admits that Michelle Hughes' son, was involved in the violent beating of Tarrill Peters Sr. and was also a suspect in his death, so the Defendant Officers' allegedly stating "someone was going to jail" could hardly infer a threat or coercion, especially where Plaintiff himself refers to the so-called threat as "implicit". Dkt. No.1 at ¶83.

Witness Roy Anderson relayed that Plaintiff jumped into a car heading eastbound on Kamerling Avenue. Though Roy Anderson was not sure if Plaintiff hit Tarrill Peters, Sr. with the vehicle, he observed Plaintiff make a **U-turn at the end of the block and swerve into** Tarrill Peters, Sr., himself and Angela Hughes. Dkt. No.1 at ¶69. Again, this statement provided Defendants with probable cause to arrest and charge Plaintiff with each and every count that Plaintiff was detained for, murder, attempt murder, and aggravated battery.

Taconda Douglas reported to Defendants that she observed Plaintiff jump into a car and "**drive at** the group of people in street, striking some people in the group." Dkt. No.1 at ¶72. Taconda Douglas further stated that Plaintiff **returned** and ran over decedent, Tarrill Peters, Sr. again before fleeing. *Id.* Yet again, a statement that Plaintiff does not dispute, and one that clearly indicates that the Defendants had probable cause to arrest and detain Plaintiff for murder, as well as the other charges.

The only issue before this Court, is whether the Complaint, as pled by Plaintiff, states sufficient

4

evidence to prove that Defendants had probable cause to arrest and charge Plaintiff. Clearly, based on the statements of the witnesses, Defendants had probable cause to arrest and charge Plaintiff with aggravated battery, attempt murder, and first-degree murder. Accordingly, this Court's analysis starts and stops with probable cause.

As stated in Defendants' Joint Motion to Dismiss Plaintiff's Complaint, the Seventh Circuit has affirmed, "probable cause demands even less than **probability** . . . it requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (internal citations and quotations omitted and emphasis added).

The determination of whether an arresting officer has probable cause to arrest an alleged offender turns on whether a reasonable person in the officer's position would have probable cause to believe that an offense has been committed. This inquiry, in turn, depends upon whether the facts and circumstances communicated to the arresting officer at the time of the arrest would warrant a reasonable officer in holding such a belief. *Id.*

In *Woods,* as here, Defendants correctly note that "so long as a reasonably credible witness or victim informs the police that someone has committed ... a crime, the officers have probable cause to place the alleged culprit under arrest ..." *Id. (citing Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir.1998)), and that once such a reasonably credible complaint has been made, the existence of probable cause to arrest does not depend upon the actual truth of the complaint. As the *Woods* Court noted, "probable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth that matters." *Id. (*citing *Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir.1998)).

Similarly, just as this Court held in *Brown v. City of Chicago*, Plaintiff cannot proceed on this Fourth Amendment alleged unlawful pretrial detention claim simply because he claims (without support) that it was only the fabricated evidence that led to his detention. *Brown v. City of Chicago*, No. 12 C 1764, 2020

5

WL 6135468, at *5 (N.D. Ill. Oct. 16, 2020). The statements of the witnesses claiming Plaintiff "swerved" at his father, or that he "made a U-turn" to come back and hit his father, or that he drove "at" his father, were sufficient probable cause under the Fourth Amendment, so that is the end of this Court's evaluation.

Plaintiff incorrectly likens this case to *Manuel* by claiming that but for Defendants "fabricated" narrative that Plaintiff intentionally ran over his father three times he would not have been detained for years. *See* Pl's Resp. at pg.4. However, unlike *Manuel,* Plaintiff cannot say that his detention was based solely on fabricated evidence provided by the police. Plaintiff completely disregards that his Complaint admits that the **initial** statements of **several witnesses** and not the Defendants Officers, indicate that Plaintiff returned to run over his father for a second time. Plaintiff's Complaint does not and cannot argue that running his father over twice would have provided for a different result at his bail hearing.

Plaintiff relies on *Anderson*[2] to support his contention that his Fourth amendment claim is viable simply because he should not have been charged with first degree murder. However, In *Anderson*, the Court specifically stated:

> … 'There is only a Fourth Amendment claim—the absence of probable cause that would justify the detention. The problem is the wrongful custody.' *Manuel v. City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (citations omitted). The analysis is "a plain-vanilla Fourth Amendment" analysis. *Id.* By alleging he was detained without probable cause, plaintiff has stated a claim under *Manuel.*

<u>Anderson v. La Penna</u>, No. 18 C 6159, 2019 WL 1239667, at *3 (N.D. Ill. Mar. 18, 2019).

This clearly supports Defendants' argument that the statements of the of witnesses as pleaded by Plaintiff, bar his claim under the Fourth Amendment. Because Plaintiff's own factual pleadings show probable cause to arrest and charge Plaintiff with his father's murder at the time of the incident, these facts also provide probable cause for Plaintiff's pre-trial detention. Consequently, Plaintiff's claims that

---

[2] Plaintiff also relies on a transcript from the *Domingo* case, however, Plaintiff did not attach that transcript to his Response as indicated. Defendants are therefore unable to review and discuss the findings as argued by Plaintiff.

6

his detention was the result of the Defendant Officers alleged fabricated evidence or supposed attempts to bolster testimony simply does not withstand reason. This Honorable Court should accordingly grant Defendants' motion to dismiss as to Count I of Plaintiff's Complaint.

## II. PLAINTIFF'S CONSPIRACY CLAIM MUST BE DISMISSED.

Plaintiff cites to *Geinosky v. City of Chicago,* 675 F.3d 743, 749, "to state a conspiracy claim under 42 U.S.C. § 1983, a plaintiff must allege facts to show that at least two individuals, one of whom is a state official reached an agreement to violate plaintiff's constitutional rights. While partially true, Plaintiff must first prove that the alleged conspiracy *deprived the plaintiff of a constitutional right,* as conspiracy is not an independent basis of liability in § 1983 actions. *See e.g. Smith v. Gomez,* 550 F.3d 613, 617 (7th Cir.2008) (citing *Cefalu v. Vill. Of Elk Grove,* 211 F.3d 416, 423).

Moreover, to prove a conspiracy to deprive Plaintiff of his constitutional rights, Plaintiff must show that the Defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding," and that they had a "meeting of the minds." *Amundsen v. Chicago Park Dist.,* 218 F.3d 712, 718 (7th Cir.2000).

While well-pleaded allegations are presumed to be true, and all inferences are read in the light most favorable to the plaintiff, *Lavalais v. Village of Melrose Park,* 734 F.3d 629, 632 (7th Cir.2013), this presumption is not extended to "legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Alam v. Miller Brewing Co.,* 709 F.3d 662, 666 (7th Cir.2013) (citing *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir.2009)).

Plaintiff's conspiracy claim is simply not pleaded with proper specificity. While concededly, there is no heightened pleading standard for conspiracy claims, Plaintiff has failed to assert any allegation of communications between the Defendant Officers to deprive Plaintiff of a constitutional right or even, which Defendant Officers allegedly committed, which conspiratorial acts or when. *See Andrews v. Burge,* 660 F.Supp.2d 868, 879–80 (dismissing conspiracy claim where plaintiff made "general allegations that

all defendants conspired with all other defendants and everything alleged against one is alleged against all"). Plaintiff cannot lump all the Defendant Officers together in an allegation in a conclusory fashion, without showing what each individual Defendant Officer allegedly did, and by doing so, Plaintiff has failed to properly put the Defendant Officers on notice of the allegations made against them. Accordingly, Plaintiff's Complaint at Count II is properly dismissed.

### III. PLAINTIFF FAILS TO PLEAD A PLAUSIBLE MONELL CLAIM.

Plaintiff makes conclusory assertions of what are essentially alleged to be City *de facto* policies but asserts no specific examples of what the policies are or how they are deficient. Moreover, Plaintiff fails to show how or to what extent the alleged *de-facto* policies were causally related to Plaintiff's alleged constitutional injury. Lastly, Plaintiff fails to show that the City was deliberately indifferent to any unconstitutional policy.

To survive the pleadings stage for a *Monell* claim, Plaintiff must plead factual content that allows the Court to draw the reasonable inference that the City maintains the problematic policy or practice in question. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). This entails "provid[ing] some specific facts to support the legal claims asserted in the complaint" and must have "enough detail about the subject matter of the case to present a story that holds together." *Id.*; *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Here, Plaintiff alleges that the City maintains a slew of *de-facto* policies that purportedly resulted in Plaintiff's injury but Plaintiff's alleged allegations regarding failure to discipline, failure to train and failure to eliminate a code of silence, for example, are vague and conclusory and should therefore be disregarded. *See e.g. Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017); *Jones v. Hunt*, 2020 WL 814912, 19 C 4118 (N.D. Ill. Feb. 19, 2020)(Ellis, J.)(broad allegations of "misconduct" not tailored to identify particular police training procedures or policies are insufficient to state a *Monell* claim).

Other than citing to the conclusory statements cited in the DOJ Report, or those made by certain city officials, who were clearly working to eradicate corruption, Plaintiff fails to point to any other specific incidents in the past that are causally connected to Plaintiff's claim. Plaintiff further fails to explain what

8

the City's actual practices are for disciplining, training, reporting of police officer misconduct or where those practices are lacking. Absent those facts, Plaintiff cannot demonstrate a custom or practice. *See e.g. Taylor v. City of Chicago,* 2021 WL 4523203 at *3 (N.D. Ill, October 23, 2021) (Shah, J.) (*citing Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

Plaintiff's allegations further fail to demonstrate how these alleged policies were the "moving force" behind Plaintiff's alleged constitutional injury. In fact, many courts within this district have dismissed similarly deficient *Monell* claims for failing to meet the minimum pleading requirements. *See Brown v. City of Chicago*, 19 C 8466, Docket No. 68 at pp. 3 (N.D. Ill. November 20, 2020) (Bucklo, E.)(Conclusory allegations about the City's general failure to train, supervise, and discipline its officers do not rest on sufficient factual matter to raise their right to relief under *Monell* above the speculative level.); *Turner v. City of Chicago*, Docket No. 51, 19 C 272 (N.D. Ill. March 31, 2020) (Coleman, J.) ("threadbare assertion that other instances similar to this have occurred in some manner, by some unspecified officers during an unspecified time period" does not raise claim to relief above speculation).

Plaintiff also asserts that the City's widespread custom or practice of using investigative alerts were applied to Plaintiff, witnesses, and alternate suspects in connection with the death of Tarrill Peters, Sr. Dkt. No.1 at ¶¶ 54, 117, 118. Plaintiff makes no showing however, that would provide the court reasonable inference that the City's established policy permitting investigative alerts were used in a way to violate plaintiff's Fourth Amendment rights or that this policy has any causal connection to Plaintiff's alleged constitutional injury of supposed wrongful pre-trial detention.

Plaintiff further cites to the DOJ report to support his contention that the Chicago Police Department has elicited coerced fabricated testimony in support of other, often-vacated criminal convictions but fails to describe any of these incidents with specificity or how they were causally connected to Plaintiff's alleged injury. Accordingly, the DOJ report cannot successfully bridge the gap of Plaintiff's otherwise implausible *Monell* claim.

Plaintiff's reliance on *Arrington* is also misplaced. The injuries in *Arrington* arose when a City police officer used his police vehicle to ram a fleeing automobile, leading to the death of a passenger. *Arrington v. City of Chi.*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168, at *3 (N.D. Ill. Jan. 30, 2018). The decedent's mother filed suit against the City, alleging the City caused the decedent's death through a practice of tolerating and covering up the use of excessive force by its police officers. *Id.* In support thereof, Plaintiff made the following allegations:

> i. The City had notice of the "routine" use of excessive force by Chicago police officers.
> ii. The City enables this custom of excessive force in the police department through a "code of silence" involving "a widespread practice of officers testifying dishonestly, making false reports, hiding and destroying evidence, failing to require official reports of official police activities, and/or failing to require complete and honest reports." *Id.*

There, the plaintiff also alleged that City officers were in fact lying and covering up information pertaining to the decedent's case by making false reports. *Id.* In support of his claim for widespread customs and practices, Arrington cited six other instances of excessive force verdicts against the City, and further alleged that the City failed to investigate three of the six of those instances. *Id.* In denying the City's 12(b)(6) motion to dismiss, the Court found that, in light of the Department of Justice Report (*"DOJ Report"*), which the Court took judicial notice of, it could plausibly infer that the City has a custom or practice of tolerating or enabling the use of excessive force by its police officers, and that the City was on notice of that custom or practice during the relevant time period prior to the decedent's death. *Id.* at 9-10.

However, as the *Arrington* court made unequivocally clear, the existence of the DOJ Report does not obviate the pleading requirements of *Twombly*. *Arrington*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168, at *16; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The reality is that *Arrington* did set out those requisite facts, and after the court struck conclusory allegations of "excessive force," Plaintiff's complaint nonetheless stated a claim. In contrast, here, Plaintiff's claims fail. While he does allege an injury, there are only legal conclusions about countless alleged widespread practices and the City's alleged notice of same.

10

In contrast, *Arrington* alleged both the existence of a *specific* custom or practice of dishonesty, and further alleged that the Defendant officer misrepresented facts regarding the deadly accident in furtherance of that custom or practice. *Arrington v. City of Chi.*, No. 17 C 5345, 2018 U.S. Dist. LEXIS 14168, at *3.

Plaintiff asserts that Defendants' motion is silent on any City attempts to remedy recognized shortcomings in CPD policies and practices but just as the court cannot "bury its head in the sand to the fact that other incidents and/or complaints…in fact exist", as the Court in *Arrington* noted, neither can the Court ignore the fact that at the time of and since Plaintiff's injury, the City Council, Mayor and Police Superintendents have been strong advocates for police accountability and reform, most recently with the new mayoral administration's promises of a new era of accountability in the police department. *See generally Bonds v. City of Chi.*, 451 F. Supp. 3d 900, 909 (N.D. Ill. 2020). These promises have been memorialized in a variety of different legislative methods, In 2016, the year of the incident in question in this case, the City Council passed an ordinance that established the Civilian Office of Police Accountability "COPA" and a Public Safety Deputy within the Office of the City Inspector General.[3] In that ordinance, the City Council specifically stated the following:

- WHEREAS, effective oversight is essential to maintaining a professional, well-managed, ethical and properly functioning Police Department; and

- WHEREAS, both the Police Department and the residents of the City whom the Police Department serves should be able to rely on an impartial, effective, and adequately-resourced oversight office to conduct objective, thorough, and independent investigations into the matters within the office jurisdiction, and

- WHEREAS, Trust in the oversight office's ability to provide independent oversight is critical and must be established and maintained; and

- WHEREAS; The Mayor and City Council are committed to providing the resources needed to properly investigate allegations of police misconduct, ensuring the expertise of personnel who

---

[3] A court can take judicial notice of an ordinance without converting a motion to dismiss into a motion for summary judgment. *Missouri Pet Breeders Ass'n v. Cty. of Cook*, 119 F. Supp. 3d 865, 869 (N.D. Ill. 2015)(citing *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir.1977).

11

- conduct such investigations, and establishing the credibility of the investigations and inspiring the community's confidence in their quality and independence; and

- WHEREAS, The Mayor of the City of Chicago ("Mayor") established the Police Accountability Task Force ("PATF") to review the system of accountability, oversight and training that is currently in place for the Police Department and recommend reforms to the current system to improve independent police oversight; and

- WHEREAS, The PATF actively engaged the community, victims' rights groups, law enforcement, and youth, religious and elected leaders to ensure its findings and recommendations were based on input from all parts of the City; and

- WHEREAS, The PATF developed comprehensive findings and recommendations concerning community and police relations, police oversight and police accountability; and

- WHEREAS, The Mayor and City Council of the City of Chicago have reviewed the findings and recommendations of the PATF, and seek to implement recommendations that address Police Department accountability and oversight by ordinance; and

- WHEREAS, This ordinance establishes a two-part structure to carry out the goal of enhancing the Police Department accountability and oversight: (1) the establishment of the Civilian Police Office of Accountability to promptly, effectively and fairly investigate complaints concerning police misconduct and abuse, and incidents involving the most serious uses of force by police officers, and (2) the creation of a Deputy Inspector General to audit and review the policies, procedures, and practices of the Chicago Police Department, the Police Board, and the Civilian Office of Police Accountability, and thereby enhance transparency, accountability, and quality of oversight.

SO2016-6309, "Amendment of Municipal Code Title 2 by repealing Chapter 2-57, adding new Chapter 2-78 and modifying Chapter 2-56 regarding police accountability," attached as Exhibit B.

This ordinance shows the City's legal commitment to improving police accountability, training, and oversight, as well as providing the resources to effect that.[4] Substantively, the ordinance afforded COPA exclusive authority to investigate a variety of complaints, including unlawful seizures, improper search, excessive force, coercion, verbal abuse, officer involved shootings, taser discharges, in-custody

---

[4] Indeed, from 2018 to 2021, the publicly available appropriation ordinances establish that the City appropriated $37,354,233 to COPA. *See* Exhibits C, D, E and F. Moreover, while the court can take judicial notice of these ordinances (*Newcomb* 558 F.2d at 829), it should be questioned whether, considering all that was publicly known, Plaintiff met his Rule 11 obligation to investigate the merits of his claims of deliberate indifference (and whether Plaintiff can maintain this position in his response). The advisory committee notes to Rule 11 specifically state that "a litigant's obligations with respect to the contents of [pleadings] are not measured solely at the time they are submitted to the court but include…advocating positions contained in those pleadings and motions after they learn that they cease to have any merit."

deaths, denial of counsel, civil lawsuits, and pattern and practice investigations. (*Exh. B*, SO2016-6309; Municipal Code § 2-78 *et seq*). The ordinance also grants subpoena power and the power to recommend discipline or training. (*Exh. B,* §§ 2-78-120, 2-78-130). It also requires that investigations be concluded within 6 months absent a justified extension and contains strict deadlines for the Superintendent to respond to the discipline recommended by COPA. (*Exh B,* §§ 2-78-135, 2-78-130).

With respect to the Public Safety Deputy Inspector General, the ordinance grants authority to "make recommendations, based on its reviews and audits, to the Police Department, the Police Board and the Office with respect to changes in policies, procedures, practices, operations, directives, training and equipment to address any deficiencies or problems or implement any improvements identified by its reviews and audits." (*Exh. B*, SO2016-6309; Municipal Code § 2- 56-230). It also authorizes recommendations to other City departments and agencies that the Public Safety Deputy determines are necessary or helpful to affect its recommendations as to the Police Department and the Police Board. *Id.*

The ordinance then *obligates* the Public Safety Deputy to do the following:

- Conduct periodic analysis and evaluation of closed disciplinary investigations to identify trends and summarize the number and results of such investigations, and to issue an annual report containing the analysis and evaluation.

- Conduct reviews and audits or particular policies, procedures or practices of the Police Department.

- To review and audit closed disciplinary investigations and make findings and recommendations, including recommendations that an investigation be reopened if appropriate.

- To review and audit the Police Department's policies, practices, programs and training with respect to constitutional policing, discipline and use of force and to make recommendations to the City Council to address problems or deficiencies.

- To review, audit and analyze civil judgments and settlements against members of the Police Department.

- To review and audit disciplinary recommendations by the Police Department and Police Board.

(*Exh. A*, SO2016-6309; Municipal Code § 2-56-230).

This Honorable Court can and should take judicial notice of this ordinance, review it in tandem with the DOJ Report, and justifiably conclude the mere fact that the City's corporate authorities at some time allegedly acquiesced to an unconstitutional custom or practice does not mean that the same body politic is condemned to such fate in perpetuity.

Moreover, the City in January of 2019 voluntarily entered into a Consent Decree with the State of Illinois requiring improvements to numerous aspects of the City's policing. The Consent Decree, referencing the City's commitment to "constitutional and effective law enforcement" (page 1), is 236 pages, and contains numerous commitments to impartial policing, use of force reforms, new training, supervision, accountability, data collection, and more. A true and correct copy of the Consent Decree can be located at http://chicagopoliceconsentdecree.org/wp-content/uploads/2019/02/FINAL-CONSENT-DECREE-SIGNED-BY-JUDGE-DOW.pdf. These reforms at the time of and after Plaintiff's alleged constitutional injury indicate the *exact opposite* of deliberate indifference.

Deliberate indifference has a plain and ordinary meaning. Deliberate indifference means what it says – turning a blind eye despite knowing about similar and widespread constitutional violations so numerous as to constitute a custom or usage permeating the Department. *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) ("we have consistently held that deliberate indifference "requires a showing of more than mere or gross negligence."); *See also Beal v. Blache*, No. CIV.A.02-CV-12447-RG, 2005 WL 352861, at *6 (D. Mass. Feb. 14, 2005)("perfect foresight is not the standard by which official conduct is judged.")

Here, the evidence of meaningful reforms is clear and direct, plainly manifesting, on its face, a desire by final policy makers to ensure constitutional policing in Chicago. *See ECF 23 p. 3 of 9*. The Court can read the stated intention of the City in the form of the new legislation and throughout the Consent Decree. (*State of Illinois*, 17 CV 6260, ECF No. 703-1.)

Merely citing to the DOJ Report is not *carte blanche* justification to open the coveted doors of

14

discovery in a *Monell* claim. *See Carmona v. City of Chi.*, No. 15-cv-00462, 2018 U.S. Dist. LEXIS 49117, at \*12 (N.D. Ill. Mar. 26, 2018) ("The DOJ report certainly identifies serious shortcomings in CPD's supervisory systems, but the Court cannot countenance it as a master key to unlock discovery's door for any *Monell* claim against the City, no matter how scantily the plaintiff connects his claim to the report's findings"). Plaintiff's *Monell* claim fails for failure to allege sufficient facts to establish the existence of a specific widespread unconstitutional policy was the "moving force" behind Plaintiff's alleged constitutional injury and for failing to show deliberate indifference by the City. Accordingly, as a matter of law, Plaintiff's *Monell* claim in Count III should be dismissed with prejudice.

## CONCLUSION

Wherefore, Defendants Sgt. Michael Petraksi, Det. Juan Morales, Det. Arthur Taraszkiewicz, Det. Joseph Marszalec, Det. John Campbell, Sgt. Thomas Flaherty, and Defendant City of Chicago, request this Court dismiss Plaintiff's Complaint pursuant to Federal Rule of Rule12(b)(6) and grant any further relief as this Court deems appropriate.

Dated:  December 16, 2021                              Respectfully submitted,

                                                            */s/ Jessica L. Griff*
                                                            Jessica L. Griff
                                                            Assistant Corporation Counsel Supervisor

Gregory Beck Assistant Corporation Counsel Supervisor
City of Chicago Department of Law
2 N. LaSalle, Suite 900
Chicago, IL 60602
(312) 744-2826
Attorneys for Defendant officers

                                                            CELIA MEZA,
                                                            CORPORATION COUNSEL FOR THE
                                                            CITY OF CHICAGO

                                                            By: */s/ Eydie R. Vanderbosch*
                                                            Special Assistant Corporation Counsel

Eydie R. Vanderbosch, Esq. #6277536
Eydie R. Vanderbosch Esq Legal and Consulting Services, LLC.
10 S. Riverside Plaza, Suite 875
Chicago, IL 60606
312-474-6043

**IN THE UNITED STATES DISTRICT COURTNORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| TARRILL PETERS, JR. ) | |
| ) | Case No. 21 C 4366 |
| Plaintiff, ) | |
| ) | Judge Charles R. Norgle |
| v. ) | |
| ) | Magistrate Susan E. Cox |
| CITY OF CHICAGO, COOK COUNTY, SERGEANT MICHAEL PETRASKI, STAR NUMBER 21001, DETECTIVE NAN MORALES, STAR NUMBER 20741, DETECTIVE ARTHUR TARASZKIEWICZ, STAR NUMBER 21183, DETECTIVE JOSEPH MARSZALEC, STAR NUMBER 21234, DETECTIVE JOHN CAMPBELL, STAR NUMBER 21279, DETECTIVE THOMAS FLAHERTY, STAR NUMBER 1732, ASSISTANT STATE'S ATTORNEY MARTIN MOORS ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) | |

**NOTICE OF FILING AND CERTIFICATE OF SERVICE**

Messrs. Craig C. Martin, Michael G. Babbitt
Aaron J. Hersh, Bianca L. Valdez 300 North LaSalle
Chicago, Illinois 60654-3406
(312) 728-9000

**PLEASE TAKE NOTICE** that on this 16th day of December, 2021, I have caused to be e-filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division **CITY DEFENDANTS' JOINT REPLY TO MOTION TO DISMISS**, a copy of which is herewith served upon you.

I hereby certify that I have served this notice and the attached document by causing it to be delivered by electronic means to the person named above at the address shown this 16th day of December, 2021.

                                                                                  */s/ Eydie R. Vanderbosch*
                                                                                   Eydie R. Vanderbosch
                                                                                   Special Assistant Corporation Counsel

16

Eydie R. Vanderbosch, Esq. #6277536
Eydie R. Vanderbosch Esq Legal and Consulting Services, LLC.
10 S. Riverside Plaza, Suite 875
Chicago, IL 60606
312-474-6043
Attorney for City of Chicago