# EXHIBIT 1

## TO PLAINTIFF'S RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS (DKT. 46)

1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3   CRISPINIANA DOMINGO,              )
                                      )
4              Plaintiff,             )  Case No. 18-cv-04653
                                      )
    -vs-                              )
5                                     )  Chicago, Illinois
    JUSTIN WOODEN, et al.,            )  August 16, 2021
6                                     )  11:51 a.m.
               Defendants.            )
7

8        TRANSCRIPT OF TELEPHONIC PROCEEDINGS
       BEFORE THE HONORABLE MARTHA M. PACOLD

9   TELEPHONIC APPEARANCES:

10  For the Plaintiff:    MR. RICHARD J. DVORAK
                          Dvorak Law Offices, LLC
11                        6262 Kingery Highway, Suite 305
                          Willowbrook, IL 60527
12                        (312) 593-7146
                          Richard.dvorak@civilrightsdefenders.com
13

14  For the Defendants:   MR. MAURICE GRANT
                          MS. SENIJA GREBOVIC
15                        Grant Law, LLC
                          230 West Monroe Street, Suite 240
16                        Chicago, IL  60606
                          (312) 551-0111
17                        Mgrant@grantlawllc.com
                          sgrebovic@grantlawllc.com
18

19  Court Reporter:

20        KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                 Official Court Reporter
21              United States District Court
           219 South Dearborn Street, Suite 1426
22              Chicago, Illinois  60604
             Telephone:  (312) 435-5569
23          Kathleen_Fennell@ilnd.uscourts.gov

24     * * * * * * * * * * * * * * * * * *

25        PROCEEDINGS REPORTED BY STENOTYPE REPORTER
    TRANSCRIPT PRODUCED WITH COMPUTER-AIDED TRANSCRIPTION

1       (Proceedings heard via teleconference:)

2           THE COURTROOM DEPUTY:  18 C 4653, Domingo versus

3   Wooden.

4           Counsel, if you can state your name for the record,

11:50:45   5   we'll start with plaintiff's counsel.

6           MR. DVORAK:  Yes, good morning.  Richard Dvorak for

7   the plaintiff.

8           THE COURT:  And for defense?

9           MR. GRANT:  Maurice Grant and Senija Grebovic on

11:51:09   10   behalf of all defendants.

11           THE COURT:  Okay.  Good morning, everyone.  Thank you

12   for your patience and apologies for the delay here.

13           I wanted to give you a ruling on the summary judgment

14   motion.  Is there anything we should address before I do that?

11:51:28   15           MR. DVORAK:  No, your Honor.

16           MR. GRANT:  No, your Honor.

17           THE COURT:  Okay.  So let me just begin with a brief

18   overview of the record.  The parties are familiar with the

19   facts of the case, but I'll just start with a brief overview

11:51:47   20   of the record before I reach the merits of the summary

21   judgment motion.

22           Plaintiff Crispiniana Domingo was working as a nurse

23   at the University of Illinois at Chicago Hospital on May 14,

24   2016, when a co-worker, Defendant Erica Williams, saw Domingo

11:52:07   25   interacting with a crying eight-month-old baby boy under

Domingo's care.  Williams reported, first to colleagues and
then to the police, that Domingo was slapping the baby on the
back of his head.

Police Officer Justin Wooden was assigned to
investigate the allegations.  During his investigation, Wooden
interviewed both Williams and Domingo.  Williams and Domingo
gave conflicting versions of events.

Williams stated that she had been sitting at her work
station when she heard the baby cry intensely for about
15 minutes.  Concerned for the baby's welfare, Williams got up
from her desk and went into the room to check on the baby.
When she entered the room, she witnessed Domingo slapping the
baby approximately three times on the back of his head with an
open hand.  Williams explained that she was so shocked by what
she saw that she sent a text message to a co-worker, stating
that she had caught Cris Domingo slapping one of the babies
upside his head.

Wooden obtained a copy of Williams's phone records,
which confirmed Williams's testimony about the text message.

That was Williams's version of events.

Domingo, in contrast, told Wooden that she, Domingo,
never slapped the baby.  According to Domingo, she was
attempting to lower the side rail on the baby's crib when the
rail slipped and fell, creating a loud crashing noise that
startled the baby.  The baby began to cry, so Domingo picked

1   him up and attempted to soothe him by patting him on the back

2   of his head.  Domingo also stated that Williams came into the

3   room to deliver a medical ID bracelet, not because she,

4   meaning Williams, was concerned by the baby's crying.

5   11:54:17        So that was Domingo's version of events.

6                There were no other direct witnesses to the incident,

7   but Wooden reviewed hospital video surveillance footage which

8   confirmed that Williams and Domingo had both been in the

9   baby's room during the time of the alleged slapping incident.

10  11:54:41  Wooden also spoke with another hospital employee, Michael

11  Carey, who was working near the room where Domingo was caring

12  for the baby.

13                Carey confirmed that he heard a crashing sound

14  followed by a baby crying.  When he looked into the room, he

15  11:55:00  saw Domingo picking up the baby.

16                Wooden expanded his investigation, interviewing

17  several of the baby's doctors and reviewing a comprehensive

18  medical report authored by Dr. Amanda Fingarson, a

19  pediatrician who specializes in child abuse.  The baby's

20  11:55:21  doctors explained that the baby had suffered a fresh fracture

21  to his left arm that was consistent with someone grabbing the

22  arm, whether inadvertently or deliberately, in combination

23  with some twisting motion.  The fracture emerged at around the

24  same time as the alleged slapping incident.

25  11:55:46        Doctors also explained, however, that the baby

1    suffered from health conditions that can make bones

2    particularly susceptible to fractures, although one doctor

3    stated that this baby's particular test results indicated that

4    he likely should not be prone to spontaneous fractures.

5    In addition to the arm fracture, the baby showed

6    signs of two subdural hematomas, meaning pools of blood

7    between the brain and its outermost covering.  A neurologist,

8    Dr. Saran, explained that subdural hematomas are injuries most

9    commonly associated with shaken baby syndrome and considered

10   non-accidental trauma, but also noted that the injury may have

11   been caused by weak blood vessels in conjunction with strikes

12   to the back of the head and that the hematomas could be up to

13   six months old.

14   Moreover, the baby's primary care physician,

15   Dr. Rossini, concluded that the hematomas were not acute and

16   did not present with any other signs of abusive head trauma.

17   On July 5th, 2016, Dr. Fingarson drafted and sent to

18   Wooden a report reviewing all this medical evidence.  Her

19   report explained that she was concerned by -- or concerned for

20   the possibility of abuse in the baby's case but that due to

21   the baby's underlying medical conditions, she could not

22   definitively conclude that an abusive force/action would have

23   been required to cause the baby's arm fracture.

24   Dr. Fingarson also could not conclude that the baby's

25   subdural hematomas were necessarily abusive in nature, noting

1    that they could have been caused by trauma but also could have
2    been caused by a much older birth-related injury.

3              After reviewing all this information, Wooden arrested
4    Domingo on July 6th, 2016, and charged her with two felony
5    counts involving aggravated battery to a child.  On July 7th,
6    Domingo's bail was set at $300,000.  It took Domingo and her
7    family and friends until July 12th to post the requisite bond,
8    and so during that time, Domingo was in custody between the
9    arrest on July 6th and posting bond on July 12th.

10             On July 20th, Domingo was indicted on the two felony
11   counts after a grand jury heard Wooden testify that there was
12   nothing else that could explain how it was the baby broke his
13   arm and also sustained trauma to his head besides the actions
14   of Nurse Crispiniana Domingo.

15             Domingo's criminal trial took place on February 26,
16   2018.  Immediately before trial began, the prosecution amended
17   the charges against Domingo to a single charge of misdemeanor
18   battery.  That same day, following a bench trial, Domingo was
19   found not guilty and was released.

20             After her acquittal, Domingo filed this lawsuit,
21   bringing Section 1983 claims against Wooden for false arrest
22   and unlawful pretrial detention, as well as a state law claim
23   for malicious prosecution.  The complaint also brings a state
24   law malicious prosecution claim against Williams.  Wooden and
25   Williams have moved for summary judgment on all claims against

1    them.  For the reasons I'll explain, that motion is granted in
2    part and denied in part.
3         In addition, Domingo has filed an unopposed motion to
4    substitute an exhibit, which is docket 79, and that motion is
5    hereby granted.
6         Summary judgment is proper where the movant shows
7    that there is no genuine dispute as to any material fact and
8    the movant is entitled to judgment as a matter of law.  That's
9    Rule 56(a).  In adjudicating a motion for summary judgment,
10   the court gives the non-moving party the benefit of reasonable
11   inferences from the evidence, but not speculative inferences
12   in its favor.
13        I'll first turn to the false arrest claim against
14   Wooden.
15        So defendants first seek summary judgment on
16   Domingo's false arrest claim against Wooden.  To prove a claim
17   for false arrest under the Fourth Amendment -- and, of course,
18   at this stage, I'm not applying a standard that requires proof
19   of the claim, but we're applying the summary judgment
20   standard -- but just to give the elements of the claim for
21   false arrest under the Fourth Amendment, a plaintiff must come
22   forward with evidence that the defendant arrested the
23   plaintiff, that the defendant did not have probable cause to
24   arrest the plaintiff, and that the defendant acted under color
25   of law.  Probable cause exists if, at the time of the arrest,

1   the facts and circumstances within the defendant's knowledge

2   are sufficient to warrant a prudent person, or one of

3   reasonable caution, in believing, in the circumstances shown,

4   that the suspect has committed an offense.  That's *Muhammad v.*

5   *Pearson*, 900 F.3d 898, 908 (Seventh Circuit 2018).

6          An officer has probable cause to arrest a suspect so

7   long as he reasonably believes that the suspect committed any

8   crime, even if it is not the crime ultimately charged.  That's

9   *Devenpeck v. Alford*, 543 U.S. 146 (2004).

10          In addition, where a defendant has raised a qualified

11   immunity defense to a false arrest claim, as Wooden has done

12   here, he is shielded from suit so long as a reasonable officer

13   could have believed probable cause existed even if that belief

14   was mistaken.  *Fleming v. Livingston County, Illinois*, 674

15   F.3d 874, 878, Seventh Circuit 2012.  In other words, the

16   defendant is protected so long as there was arguable probable

17   cause to support the plaintiff's arrest.  *Fleming* case at

18   page 880.

19          Wooden argues that he had at least arguable probable

20   cause to arrest Domingo and that the doctrine of qualified

21   immunity thus bars Domingo's false arrest claim.  The

22   existence of probable cause depends in the first instance on

23   state law.  Federal law asks only whether the officers had

24   probable cause to believe that the predicate offense, as the

25   state has defined it, has been committed.  *Williams v.*

*Jaglowski*, 269 F.3d 778, 782 (Seventh Circuit 2001).

Here Wooden argues that there was probable cause to suspect Domingo of committing misdemeanor battery under 720 ILCS 5/12-3.  That statute provides that a person is guilty of misdemeanor battery "if he or she knowingly, without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual."

At the time Officer Wooden arrested Domingo, his investigation revealed the following information:

Williams saw Domingo touching the baby on the back of the head several times with an open hand.  Williams characterized these touches as slaps and said that she, Williams, came into the room because she had heard the baby crying for a prolonged period of time.  Domingo, on the other hand, characterized these touches as comforting pats, and said that Williams only came into the room to deliver a medical bracelet.

Williams's testimony was supported by a text message she sent to her colleague immediately after leaving the room where Domingo had been holding the baby.

The baby had sustained a fresh left-arm fracture during the time it was under Domingo's care.  This fracture occurred at around the same time as the alleged slapping incident.

1    The baby had also sustained two subdural hematomas of

2   uncertain ages, which doctors stated could have been caused by

3   slapping, but also could have been caused by a birth injury.

4           Dr. Fingarson's report concluded that the baby's

5   injuries were consistent with acute trauma and raised concerns

6   for abuse.  Nevertheless, neither Dr. Fingarson, nor any of

7   the baby's other doctors, were able to say with certainty that

8   the baby's injuries were caused by abuse, nor could any doctor

9   rule out the possibility of abuse.

10          While this conflicting evidence may not have been

11  enough to support a conviction, it was enough to support an

12  arrest for misdemeanor battery as a matter of law.  The

13  Seventh Circuit has held that the testimony of a single

14  impartial eyewitness is sufficient to support probable cause

15  for an arrest.  *Bailey v. City of Chicago*, 779 F.3d 689, 694

16  (Seventh Circuit 2015).  See also *Phillips v. Allen*, 668 F.3d

17  912, 915 (Seventh Circuit 2012).

18          Here Wooden's arrest was supported not only by the

19  testimony of an eyewitness who had no apparent grudge against

20  Domingo and no apparent motive to lie, but also by medical

21  evidence of physical trauma that doctors described as being

22  consistent with and raising concerns of intentional child

23  abuse.

24          Any reasonable jury would conclude that these pieces

25  of evidence, taken together, are enough to justify a

12:05:49

12:06:10

12:06:28

12:06:54

12:07:12

1    reasonably cautious person in believing that Domingo satisfied

2    the elements of misdemeanor battery by knowingly (1) causing

3    bodily harm to the baby or (2) making physical contact with

4    the baby in an insulting or provoking way.

5         Domingo argues that Wooden should have believed

6    Domingo's own version of events over Williams's because

7    Williams undermined her credibility by giving inconsistent

8    testimony about the reason why she entered the baby's room in

9    the first place.  Williams initially stated she entered the

10   room because she was alarmed by the crying baby, but in her

11   deposition, she indicated that she entered the room to deliver

12   a medical ID bracelet.

13        Domingo argues that the video surveillance reviewed

14   by Officer Wooden would have confirmed that Williams was

15   delivering a medical bracelet.  This apparent inconsistency

16   may have been enough to require Officer Wooden to further

17   investigate Williams's claims, but Wooden did precisely that.

18   Wooden's extensive investigation did not turn up any evidence

19   that contradicted Williams's core claim that Domingo had

20   slapped the baby apart from Domingo's own denial.

21        Moreover, Wooden's investigation uncovered medical

22   evidence of recent physical trauma that doctors believed

23   raised concerns of non-accidental child abuse, thus lending

24   additional plausibility to the notion that Domingo knowingly

25   injured the baby.

The Seventh Circuit has held that an officer faced with a suspect who denies otherwise plausible witness testimony may arrest that suspect and let prosecutors and courts determine who is telling the truth. *Askew v. City of Chicago*, 440 F.3d 894, 895 (Seventh Circuit 2006). That is what Wooden did here. Wooden, thus, had at least arguable probable cause to arrest Williams -- I'm sorry -- Domingo and is, at a minimum, entitled to qualified immunity on this count.

Turning to the unlawful pretrial detention claim. As with Domingo's false arrest claim, the parties dispute whether Domingo's pretrial detention, which again lasted from July 6th through July 12, 2016, was supported by probable cause. But whereas an arrest is constitutional so long as the officer had probable cause to believe that the suspect committed any offense, pretrial detention beyond what is known as the Gerstein hearing must be justified by probable cause supporting the specific offenses charged. In other words, as Domingo argues, and as defendants do not contest, the probable cause inquiry is charge-specific.

The two charges that form the basis of Domingo's pretrial detention were felony charges, yet defendants argue only that there was probable cause to believe Domingo satisfied elements of Illinois's misdemeanor battery statute, 720 ILCS 5/12-3. Defendants do not discuss, cite, or even

1    name, the felony charges that formed the basis of Domingo's

2    pretrial detention.  I, therefore, cannot determine whether

3    probable cause supported or arguably supported the felony

4    charges without knowing the elements of those charges and

5    without some explanation of why a reasonable person could have

6    believed that Domingo's conduct satisfied those elements.

7         And so defendants' motion for summary judgment on the

8    pretrial detention claim is denied.  See *United States v.*

9    *Dunkel*, 927 F.2d 955, 956 (Seventh Circuit 1991) (undeveloped

10   or skeletal arguments are waived).

11        Domingo's final claim against Wooden involves the

12   state law tort of malicious prosecution.  This claim requires

13   a plaintiff to show (1) the commencement or continuance of an

14   original criminal or civil judicial proceeding by the

15   defendant; (2) the termination of the proceeding in favor of

16   the plaintiff; (3) the absence of probable cause for such

17   proceeding; (4) the presence of malice; and (5) damages

18   resulting to the plaintiff.  *Swick v. Liautaud*, 169 Ill.2d

19   504, 512 (1996).

20        Defendants argue that Domingo cannot establish either

21   the presence -- either the absence of probable cause or the

22   absence -- or the presence of -- let me say that again.

23        Defendants argue that Domingo cannot establish either

24   the absence of probable cause or the presence of malice, and I

25   will address each of those arguments in turn.

12:10:51
12:11:14
12:11:31
12:11:53
12:12:13

First, defendants' probable cause argument is underdeveloped in the malicious prosecution context for the same reason that it is underdeveloped in the pretrial detention context; namely, the probable cause inquiry and the malicious prosecution context is charge-specific -- see docket 55 at page 11 conceding this point -- and the charges that spurred the commencement of criminal proceedings against Domingo were felony charges. Yet defendants argue only that there was probable cause to support a prosecution based on the subsequent charge of misdemeanor battery. Again, this argument is insufficient to justify entry of summary judgment because Domingo argues and, as defendants do not contest, Domingo can proceed with her malicious prosecution claim based on the felony charges alone.

Defendants' argument regarding malice is also not persuasive. Under Illinois law, a plaintiff may demonstrate malice by showing that the defendant facilitated the prosecution for the purpose of injuring plaintiff or for some other improper motive. An improper motive for a prosecution is any reason other than to bring the party to justice. *Kuri v. Folino*, 409 F.Supp. 3rd 626, 648 (Northern District of Illinois 2019). A jury may infer malice if it finds that a witness knowingly fabricated, concealed, or mischaracterized evidence because that type of misconduct is clearly not designed to bring a truly guilty party to justice. Here,

1   Domingo alleges that Wooden lied to the grand jury when he

2   testified that nothing else could explain how it was the baby

3   broke his arm and also sustained trauma to his head besides

4   the actions of Nurse Crispiniana Domingo that night, despite

5   having been told by numerous doctors that there were alternate

6   explanations for the baby's injuries and despite knowing that

7   Dr. Fingarson's investigation of abuse was inconclusive.

8       This raises facts and credibility issues for the

9   jury.  If the jury were to believe Domingo, the jury could

10   conclude that Wooden's testimony was knowingly untruthful and,

11   therefore, motivated by malice.  But if the jury were to

12   believe -- were not to believe Domingo and were to believe

13   Wooden, then they could find the other way.

14       Accordingly, defendants' motion for summary judgment

15   on the malicious prosecution claim against Wooden is denied.

16       Domingo's last remaining claim alleges malicious

17   prosecution by Erica Williams.  Defendants argue that Domingo

18   cannot prove Williams acted maliciously because Williams and

19   Domingo had a good working relationship with no prior

20   disagreements, but defendants do not cite, and the Court is

21   not aware of, any authority holding that the absence of prior

22   disagreements precludes a finding of malice.

23       Indeed, as I noted earlier, a jury typically can

24   infer malice if it finds that a witness lied to further a

25   prosecution.  Domingo alleges that this is what happened here.

1      She first alleges that Williams lied about her, that

2   is, Williams's motive for going into the baby's room.

3   Williams told police that she entered the room because she

4   heard the baby crying continuously for 15 minutes, but Domingo

5   argues, and Williams subsequently admitted, that Williams went

6   into the room to deliver a medical bracelet instead.

7      Next Domingo alleges that she, Domingo, touched the

8   baby only by giving him soothing pats, not forceful slaps, and

9   that the true nature of her contact with the baby would have

10  been obvious to Williams.  According to Domingo, Williams lied

11  about the nature of Domingo's contact with the baby when she

12  described it as forceful slapping.

13     Williams offers a different version of events, and,

14  again, this is a credibility and a fact issue for the jury,

15  and so summary judgment is inappropriate on this claim as

16  well.

17     And for all these reasons, defendants' motion for

18  summary judgment is granted on the false arrest claim against

19  Wooden and denied as to the remaining claims.

20     I'll direct the parties to file a joint status report

21  by August 30th, 2021, which is in two weeks, that, No. 1,

22  describes the expected length of trial; No. 2, lists dates on

23  which the parties are mutually available for trial over the

24  course of the next 12 months; and, No. 3, indicates whether

25  the parties are interested in continuing to participate in

1    settlement negotiations supervised by Judge Jantz pending

2    trial.

3         I will reiterate these requirements in a minute entry

4    that will be posted on the docket later today.  In addition,

12:17:17    5    the parties may request a transcript of today's ruling from

6    the bench if the parties wish to review my reasoning or the

7    details of today's holding.

8         Thank you, everyone.  Have a good afternoon.

9         Is there anything else anyone would like to raise?

12:17:36    10        MR. DVORAK:  No, your Honor.  Thank you.

11        MR. GRANT:  No, your Honor.  Thank you.

12        MS. GREBOVIC:  Thank you, Judge.

13        THE COURT:  Thank you, everyone.  Take care.

14      (Which were all the proceedings heard.)

15                        CERTIFICATE

16    I certify that the foregoing is a correct transcript from

17    the record of proceedings in the above-entitled matter.

18    */s/Kathleen M. Fennell*              *September 8, 2021*

19    _____          _____

20    Kathleen M. Fennell                   Date
     Official Court Reporter

21

22

23

24

25